IN THE MATTER OF HARRY L. SEARS,
AN ATTORNEY AT LAW.

Argued February 24, 1976—Decided September 30, 1976.

176

*Mr. Edward J. Farrell* argued the cause for the Morris County Ethics Committee.

*Mr. Robert N. Wilentz* argued the cause for respondent (*Messrs. Wilentz, Goldman and Spitzer,* attorneys).

The opinion of the court was delivered by
PASHMAN, J. This disciplinary matter concerns the conduct and alleged ethical violations of an attorney whose former prominence in State legal and public activities makes

his involvement in the charges against him particularly unfortunate.

Respondent Harry L. Sears was originally named in a 23-count Statement of Charges preferred by the Morris County Ethics Committee. After a hearing, the Committee filed a presentment with this Court finding that the respondent had committed ethical infractions as to ten of the original 23 charges. Of these ten charges, seven are of a similar nature. Essentially, these charges allege that respondent violated three disciplinary rules of this State[1]: DR 7–102(A)(7), (8) which generally prohibits an attorney from assisting a client "in conduct that the lawyers know to be illegal or fraudulent"; DR 9–101(C) which enjoins a lawyer from stating or implying "that he is able to influence improperly . . . any tribunal, legislative body, or public official"; and DR 1–102(A)(3), (4), (5) and (6) which generally proscribe conduct by an attorney which reflects adversely upon the profession and the attorney himself.

An evaluation of these charges and appropriate judicial response thereto require us first to examine the facts upon which they are based and then to consider the charges on their merits and the existence of mitigating or extenuating circumstances.

# I

## *Facts*

The offenses attributed to respondent primarily arise from his alleged involvement in three distinct, though closely re-

---

[1]The Disciplinary Rules of the Code of Professional Responsibility became effective in this State on September 13, 1971. Although the charges are based, in part, on conduct which occurred prior to this effective date, we nonetheless find that the Canons of Professional Ethics which preceded the Code of Professional Responsibility were sufficiently broad to encompass the substantive effect of the Disciplinary Rules with respect to the violations which are alleged in this case.

lated, series of events: an attempt to influence improperly
or limit an investigation by the Federal Securities and Ex-
change Commission; the delivery of an illegal campaign
contribution; and the giving of false testimony during in-
vestigations into the underlying conduct. Respondent's par-
ticipation in these events can be placed in perspective only
by recalling the prominent position which he once occupied
in this State.

The legal and public careers of Harry L. Sears bespeak
a reputation for professional competence, personal integrity
and distinguished public service which cast an anomalous
light on the present disciplinary matter. Respondent was
admitted to the practice of law in 1947 and, with several
other attorneys, conducted a successful legal practice in
Boonton. He was elected to several local political positions
and then to the New Jersey General Assembly where he
served as its Speaker for four years. Thereafter, he was
elected to the New Jersey Senate. Because of his ability
and effectiveness as a legislator, Sears was chosen as Ma-
jority Leader of the Senate. His meritorious service in this
capacity and on numerous commissions earned him state-
wide recognition. Particularly outstanding was his chair-
manship of the State Tax Policy Commission which issued
a highly acclaimed report in 1970 recommending funda-
mental revision of the State's tax structure. However, an
unsuccessful venture for the Republican nomination for Gov-
ernor left respondent with sizeable campaign debts and a
desire to leave public life. By means of donations, bank
loans and his own assiduous efforts, respondent was able
to satisfy all his campaign debts. His efforts in this regard
were assisted by a testimonial dinner given on his behalf
at which then-Attorney General John Mitchell appeared as
the guest of honor. Sears had become acquainted with
Mitchell during their mutual efforts on behalf of the 1968
Republican presidential campaign. Shortly thereafter, re-
spondent, despite offers of judicial and administrative posi-

tions, retired from public life and resumed his private law practice.

## A. *The S.E.C. Investigation*

Several months before he retired from the State Senate, Sears was approached by Robert Vesco, a local financier, concerning respondent's possible employment as legal counsel for a Vesco-controlled corporation, International Controls Corporation (I.C.C.). Although they had had only a passing acquaintanceship prior to respondent's candidacy for the Republican gubernatorial nomination, Vesco had made a generous contribution to Sears' campaign and had arranged a much-needed bank loan for Sears. After respondent retired from the Senate and resumed his private law practice, Vesco renewed his offer of professional employment.

The corporation on whose behalf Vesco sought Sears' services was under investigation by the Securities and Exchange Commission (S.E.C.). This investigation concerned an alleged 1970 takeover by I.C.C. of another corporation whose activities and principal, Bernard Cornfeld, had already attracted S.E.C. attention. At the time of the alleged takeover, the "target" corporation, Investors Overseas Services (I.O.S.), was subject to a 1967 consent judgment which prohibited the sale of corporate securities in the United States. Although the transaction in question, in which Vesco purchased controlling shares of I.O.S. from Cornfeld, supposedly occurred in Switzerland, the S.E.C. was concerned with whether the spirit, if not the letter, of the consent judgment had been violated. This transaction was especially significant to the S.E.C. because the purchase gave I.C.C. a controlling position in certain "off shore" (foreign) banking institutions and investment funds. Vesco denied both his controlling ownership of I.O.S. and any violation of the consent judgment. Although he retained a Washington D.C. law firm, persistent friction between the firm and the S.E.C., and his belief that the S.E.C. was systematically

harassing I.C.C., induced him to seek the services of respondent as well.

On March 18, 1971, the S.E.C. formally commenced its investigation into the financial operations of I.C.C. Although Sears was still a member of the State Senate, he apparently agreed to assist Vesco in his efforts to limit S.E.C. discovery. Among these efforts was a suit instituted by I.C.C. in Federal District Court to specifically restrict the scope of discovery by S.E.C. The nature of this suit greatly concerned Vesco who was sensitive to the suspicions which the action might arouse. He, therefore, asked respondent to approach the federal judge to whom the case had been assigned and allay any such suspicions. Although respondent advised Vesco against this course of action, he nevertheless later sent a message to an I.C.C. associate that he had effected the desired communication to the judge. After the S.E.C. investigation had intensified, Vesco requested respondent on several occasions to speak to John Mitchell in order to persuade him to take a personal interest in the inquiry. In particular, Vesco hoped that Mitchell, as a leading figure in the Administration, could induce S.E.C. Chairman William Casey personally to monitor and limit the investigation. Vesco's requests were conveyed by Sears in two letters and during three meetings with Mitchell. Respondent's efforts, however, proved largely fruitless. A meeting between representatives of I.C.C. and S.E.C. on January 19, 1972, reflected the continued tension between the two sides, and was, as Vesco described it, a "disaster."

After he retired from the State Senate, Sears agreed to become an associate counsel for I.C.C. Although his duties were never clearly delineated, he continued to represent I.C.C. with respect to the S.E.C. investigation.

## B. *The Political Contribution*

After his retirement from the State Senate, respondent retained an active interest in political matters. His influence within the State Republican Party was so great that on

several occasions he represented a former governor on matters of State and national importance. As a result of these activities, respondent was eventually asked to direct and coordinate President Nixon's 1972 re-election campaign in New Jersey.

Shortly after the January 19, 1972 I.C.C.-S.E.C. "disaster" meeting, Vesco spoke with respondent in his capacity both as counsel for I.C.C. and re-election campaign director. Vesco mentioned that he had received a mail request from the Republican Party for a political contribution, and as a major contributor in previous campaigns, indicated his desire to contribute half a million dollars to the 1972 campaign. Sears expressed reservations about so large a contribution. In particular, he noted that the recently enacted Federal Election Campaign Act of 1971, 2 *U. S. C. A.* § 431 *et seq.*, required the disclosure of the sources and amounts of contributions in excess of $50,000, and would become effective on April 7, 1972. He also noted that disclosures of so large a contribution, especially in light of the ongoing S.E.C. investigation, would appear very suspicious. Accordingly, respondent recommended that a smaller amount be contributed.

The subject of this contribution was raised at a meeting on February 11, 1972 between Sears and Mitchell which was held at the urging of Vesco. During the meeting, Sears again requested Mitchell to induce S.E.C. Chairman Casey to oversee the I.C.C. investigation. Respondent also mentioned that Vesco intended to make a substantial contribution of an undetermined amount of money up to $500,000, and expressed his concern about the concurrence of such a large contribution and the S.E.C. investigation. Mitchell replied that he would discuss the matter with Maurice Stans, Finance Chairman of the Committee to Re-elect the President.

Subsequent meetings between Vesco and national campaign officials concerning the campaign contribution were held in February and March 1972. On March 11, 1972,

Vesco informed respondent that he had pledged $250,000 to Stans who desired the contribution to be in the form of currency. No explanation was provided for this request. Sears met with Stans on April 3, 1972 to finalize arrangements. It was decided that Vesco would publicly contribute $50,000 through the New Jersey Finance Committee with the remainder to be transferred by means of a secret cash contribution. Sears offered to deliver the secret contribution prior to April 7 to avoid the effective date and disclosure requirements of the federal campaign law. However, Stans stated that this was unnecessary because the actual date of delivery was unimportant. Placing implicit trust in Stans, respondent arranged to deliver the money personally on April 10.

On that date, respondent and the president of I.C.C., Larry Richardson, flew to Washington, D.C. to meet with Stans. Richardson brought $200,000 which he gave to Stans upon arrival at his office. In the ensuing conversation, Richardson told Stans that Vesco wanted some help with regard to the S.E.C. investigation. Respondent, however, reproved Richardson, objecting to any connection between the campaign contribution and Vesco's corporate difficulties, and further indicated that there was no *quid pro quo* involved in or intended by the contribution. Soon after the meeting, Sears told Richardson that he should not have discussed the S.E.C. investigation. In response, Richardson said that Vesco had wanted them to convey an even stronger message. Richardson then returned to New Jersey while respondent remained in Washington.

At 2 P.M. on that same day, respondent met with John Mitchell. At their meeting, Sears told the then-Chairman of the Committee to Re-elect the President about the $200,000 cash contribution which he had delivered earlier that day. He also reminded Mitchell of the ongoing S.E.C. investigation and his continued requests for a meeting with S.E.C. Chairman Casey. While Sears was at his office, Mitchell telephoned Casey and arranged a meeting between Sears and

Casey for later in the day. At that subsequent meeting Sears received personal assurances from the chairman that I.C.C. would be afforded an opportunity to respond to the findings of the S.E.C. investigation and that Casey would personally review I.C.C. allegations of S.E.C. harassment.

## C. Subsequent Investigations

In August 1972, the S.E.C. obtained reliable information concerning corporate looting and other fraudulent activities of Vesco and I.C.C. As the scope of the S.E.C. investigation widened, the activities of the Vesco-controlled corporation were increasingly scrutinized. By October, the S.E.C. had traced funds representing Vesco's $200,000 secret campaign contribution to the I.C.C. treasury. Subpoenas were then issued by the S.E.C. to various officers of I.C.C., including its president, Mr. Richardson. At this point, Vesco again asked respondent to enlist the support of Mitchell. Although Mitchell was no longer either Attorney-General or campaign manager, he still exercised considerable influence. While the exact motivation for contacting Mitchell is unclear, at the very least, Vesco and respondent desired that the scope of the S.E.C. subpoenas be limited to negate inferences of looting and to de-emphasize the political nature of the contribution. While some testimony suggests that respondent merely wished to postpone the subpoenas until after the November election when the "optics" of the situation would not be so detrimental, other evidence shows that Sears desired that the subpoenas be completely withdrawn. In any event, during their October 1972 meeting Mitchell expressed the belief that the S.E.C. was concerned only with the source of the funds; and that therefore the destination of the funds as a campaign contribution was beyond the scope of the S.E.C. investigation and that the subpoenas would ultimately be withdrawn. Mitchell's conjecture proved incorrect since subsequent subpoenas were issued by the S.E.C. to obtain information concerning the use of I.C.C. funds.

On November 21, 1972, respondent again met with Mitchell. At this meeting, Sears gave Mitchell a file which contained information compiled by Vesco's Washington counsel concerning the on-going S.E.C. investigation. This information presented conclusions concerning the damaging implications of that investigation, and was accompanied by a memorandum from Vesco intended for Donald Nixon, brother of President Nixon, and ultimately for the President himself. Sears and Mitchell discussed the material and whether its contents should be divulged to others. On the basis of their discussion, respondent got the impression that Mitchell was familiar with at least some of the documents contained in the file. Because of the problematical nature of these documents, Mitchell and Sears agreed that respondent should return the material to Vesco. Though he took the file with him when he left Mitchell's office, respondent apparently placed it on a closet shelf in his home and forgot about it.

In early 1973, after completing its investigations, the S.E.C. filed a civil action in federal court against Vesco and I.C.C. with regard to a series of financial transactions in which they had been engaged. In conjunction with this action, respondent gave depositions on February 20 and 21, 1973 concerning his role in the delivery of the $200,000 secret cash contribution.

On March 6, 1973, respondent made the first of ten appearances before a federal Grand Jury investigating the activities of Mitchell and Stans. Sears was unrepresented by counsel during at least three of his Grand Jury appearances. He later retained a New Jersey attorney, William F. Tompkins, to represent him at subsequent hearings. As the result of his Grand Jury testimony and information already gathered by the United States Attorney, Sears was indicted on May 11, 1973 on a series of charges.

After the indictment, Tompkins and the United States attorneys entered into plea negotiations. Although the federal attorneys were interested in obtaining a guilty plea from

respondent on lesser charges, their offers were resisted. After further discussion, respondent finally accepted an offer of transactional immunity. The agreement included an explicit understanding that Sears would not be prosecuted for the events about which he testified.

The United States attorneys spent the next several months preparing respondent to testify for the prosecution at the Mitchell-Stans trial. The prosecutors were particularly concerned with anticipated attacks on respondent's credibility based on discrepancies in his testimony before the Grand Jury and the S.E.C. The federal attorneys were also interested in obtaining an admission of criminal guilt from respondent. They felt that an admission would avoid potential embarrassment on cross-examination by the defense, and would bolster respondent's credibility before a jury. After extensive discussions about such an admission, Sears finally gave an inculpatory oral statement to the federal attorneys which Tompkins, after learning about it, ordered retracted. Tompkins, reiterated respondent's contention that he was not involved in any criminal activity.

Shortly before the Mitchell-Stans trial, respondent was asked to review his S.E.C. depositions and Grand Jury testimony to isolate discrepancies. Specifically, he was asked to place a single paper clip beside those statements which were factually inaccurate and a double paper clip beside those which were deliberately false. Sears complied with this request without the knowledge of his counsel because he regarded the paper clipping as mere preparation for trial which would not later be considered at the trial itself. This assessment, however, proved false and at the Mitchell-Stans trial, Sears was specifically questioned about the portions of his prior testimony which he had clipped. On redirect examination, Sears stated that he had given deliberately false testimony before the Grand Jury and had admitted criminal involvement in a statement given to the United States Attorneys. Both Mitchell and Stans were ultimately acquitted of the charges brought against them.

As a result of these events, proceedings were brought against respondent by the Morris County Ethics Committee for possible ethical violations. Testimony was presented at hearings held in April and May 1975 concerning the events previously discussed herein. Of the original 23 charges against respondent, the Ethics Committee found sufficient evidence to warrant findings of violations on ten charges. We proceed to consider these ten charges and the factual bases upon which they are founded.

## II

### *Pending Charges*

As previously noted, the Morris County Ethics Committee, after a hearing which considered the allegations of its original 23-count Statement of Charges, found ethics violations on only ten charges. Specifically rejected by the Committee were charges concerning respondent's alleged violation of the Federal Election Campaign Act of 1971, concealment of a secret campaign contribution, delivery of a questionable monetary gift, attempt to limit the S.E.C. investigation of I.C.C., invocation of the fifth amendment prior to testifying at the Mitchell-Stans trial, admission that he had committed a crime, and other charges related to his allegedly false testimony before different investigatory bodies. We have reviewed the evidence and agree with the Committee that these charges were properly rejected.

The remaining charges which resulted in findings of ethical violations will be discussed below. Essentially, the respondent is charged with four different violations or groups of violations of our code of professional responsibility. We now consider each of these categories in order to assess the evidential basis of the Ethics Committee's presentment.

A. *Attempt to Influence S.E.C. Investigation*

Although the first count of the original complaint of the Morris County Ethics Committee charged respondent solely

with "delivering an illegal campaign contribution," the scope of this inquiry was expanded. Thus, we are now asked to undertake a broader review of respondent's overall conduct and his use of campaign contribution funds to influence the S.E.C. investigation of I.C.C. We find the Disciplinary Rules under which respondent has been charged to be sufficiently broad to encompass the expansion of this count.[2]

. Based upon the facts presented in Part I, *supra,* the Ethics Committee found that during the relevant one-year period, respondent met with various politically powerful figures for the explicit purpose of inducing them to use their prestige on behalf of Vesco and I.C.C. For the most part, these meet-

---

[2]Although respondent was charged in the first count of the Statement of Charges prepared by the Morris County Ethics Committee with violating the Federal Election Campaign Act of 1971, the Committee, as a result of its hearing in this matter, apparently found no violation. The First Count is therefore primarily concerned with the use of the secret Vesco contribution and other attempts by Sears to influence the S.E.C. investigation. The specific Disciplinary Rules which respondent is accused of violating provide in pertinent part:

DR 1-102 Misconduct

  (A) A lawyer shall not:

\*       \*       \*       \*       \*       \*       \*       \*

      (3) Engage in illegal conduct involving moral turpitude.

      (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

      (5) Engage in conduct that is prejudicial to the administration of justice.

      (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

DR 7-102 Representing a Client Within the Bounds of the Law.

  (A) In his representation of a client, a lawyer shall not:

\*       \*       \*       \*       \*       \*       \*       \*

      (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

      (8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

DR 9-101 Avoiding Even the Appearance of Impropriety.

\*       \*       \*       \*       \*       \*       \*       \*

  (C) A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official.

ings were conducted with people whose relationship with the S.E.C. was tangential and who, it may be inferred, were contacted solely because of their power, or former power, in government circles.[3] Furthermore, as testimony concerning Sears' meeting with John Mitchell reveals, the discussions which occurred did not concern the substantive merits of the S.E.C. investigation, but rather its scope and methods and the possibility of restricting them. The frequency of these meetings undermines respondent's suggestion that they were intended merely to convey Vesco's grievances about agency harassment.

Respondent's denial of any attempt to influence the S.E.C. investigation is further contradicted by the circumstances of his delivery of the secret campaign contribution to Stans. In this regard, the scenario at the latter's office plainly supports the theory that respondent expected that the delivery would have the hoped-for effect, despite respondent's protestations to the contrary. Upon giving the money to Stans, the I.C.C. president, Richardson, explicitly requested assistance for the corporation with regard to the S.E.C. investigation. That respondent understood the import and intent of this remark is indicated by his own reaction to it and his immediate denial of any *quid pro quo*. In any event, respondent conceded at the ethics hearing that he and Vesco ex-

---

[3]Respondent, in this regard, testified at the ethics hearing as to his relationship with John Mitchell.

Q   Would you acknowledge that you communicated with Mr. Mitchell because whether he was in or out of Government, and he was out at that time, he was a man with tremendous political clout and influence and who had a lot of ability to get results in the areas that he was looking to make results count?

A   [Sears] Yes, sir. He certainly was all of that.

Q   And that's the reason you went to him?

A   Surely, and because he was my friend and because he was involved in the matter and had been up to that point, and because he was familiar with the background of this thing, and because, as I said before, we shared in the same concern.

pected assistance in the S.E.C. investigation as a result of the campaign contribution:

> MR. CRAMP: Just one question. There is no question when you left Richardson for that day, that you, Richardson, Vesco, Stans all considered that it was given for a purpose to get some help? Richardson told you that Vesco said he wanted it in stronger language so that you knew that Vesco's purpose was to get some help?
> MR. SEARS: I knew that — *I had to know* that Vesco was giving that contribution because if he could get some help —
> MR. CRAMP: All right.
> MR. SEARS: — and attention, he would get it, absolutely. I am not trying — I am not trying to paint myself here as somebody who didn't, who was so naive and so stupid as not to know, and in Vesco's mind he hopes he gets some attention.
>
> [emphasis supplied]

Finally, respondent's meeting with S.E.C. Chairman Casey on April 10, 1972 is suggestive of an effort by Sears to influence and limit the agency's investigation. Respondent testified that the discussions at this meeting were concerned solely with Vesco's allegations of S.E.C. harassment, the issuance of over-broad subpoenas, and I.C.C.'s request for an opportunity to respond to S.E.C. staff recommendations prior to agency action. The possibility of a legal settlement was also discussed. Contrary to this explanation, however, the record clearly reflects that these matters had already been discussed by representatives of I.C.C. and S.E.C., or could have been discussed by such parties as a matter of course. Certainly, the occasion did not necessitate a special visit by a personal envoy of Vesco to the chairman of the Commission. In this regard, the scheduling of the meeting by Mitchell makes it even more suspect. Accordingly, we find that the record supports the Ethics Committee's charge on this matter.

## B. *Creating an Impression of Improper Influence*

The Ethics Committee found sufficient evidence to warrant a finding of a violation on the twenty-third count of its Statement of Charges which alleged a violation of DR 1–

102(A)(3), (4) and (6), and DR 9–101(C). Specifically, the Committee found that respondent created the impression that he would or could improperly influence a federal judge in connection with the S.E.C. investigation of I.C.C.

As noted previously, when the S.E.C. began to escalate its discovery efforts, I.C.C. filed a suit in the Federal District Court to restrict the scope of such efforts. Although respondent had not yet been retained as counsel by I.C.C., Vesco requested him to approach the federal judge assigned to the case to ameliorate any adverse impression which the judge might have about the suit. As respondent testified at the ethics hearing, Vesco was particularly concerned that the judge understand "that Bob Vesco is not a bad guy because he is suing the United States Government."

While Sears' response to this request, and his efforts to carry it out, are unclear, the Ethics Committee found no evidence which suggested that respondent actually communicated with the judge. Nonetheless, the Committee did receive a letter which respondent had sent to an I.C.C. vice-president in which he stated:

When you talk to Bob [Vesco], will you please tell him that I have made contact re the above and have done all that I can properly be done [sic] under the circumstances.

The Committee found that this letter referred to Vesco's request that respondent talk to the federal judge. Furthermore, it found that the letter furnished a sufficient basis for a DR 9–101(C) violation.

In response, respondent characterizes the letter as merely "rain-making" — that is, an effort to mollify a client who had been pressuring him to undertake a specific action. At the ethics hearing, respondent described his motivation in writing the letter:

Well, I didn't mean I made contact because I had contacted no one. It was simply a letter that I wrote to Dodd, as I recall it, knowing that Vesco was out of the country and he would be talking

with him. And the last time I had talked with him he had, you know, pressed this point and, as I said, I had not firmly enough turned him off. And this was my method of closing the matter out so far as I was concerned without any further, without being bothered any further by it.

While this statement may explain the reasons for sending the letter, it cannot justify the letter itself. As respondent concedes in his brief, "applying the highest standards of ethics, whether the conduct is covered by the Rules or not, it was improper and unethical."

In order to find a violation of Disciplinary Rule DR 9–101(C), it is sufficient that the attorney merely state or imply that he could influence the judicial tribunal improperly. It is irrelevant whether he actually makes the attempt or accomplishes the objective. *In re Caruso*, 67 *N. J.* 44 (1975); *In re Thompson*, 67 *N. J.* 26 (1975). Aside from the obvious appearance of impropriety, such a statement creates an erroneous impression that the attorney occupies a peculiarly advantageous position in his association with the judge or government official. *See A.B.A., Opinions on Professional Ethics* (1967), Formal Opinion 184 (July 23, 1938) at 457. In the instant case, the Vesco request was aimed at influencing the I.C.C. suit and was highly improper. By fostering the impression that he had satisfied or could satisfy that request, respondent's conduct fell directly within the ambit of DR 9–101(C). Consequently, we conclude that the findings of the Ethics Committee in this regard were adequately supported. *See In re Brady*, 64 *N. J.* 100 (1973).

C. *False Testimony*

Seven of the charges on which the Ethics Committee found violations concern discrepancies in respondent's testimony before various investigatory and judicial bodies. This testimony is derived from four principal sources: depositions given in connection with the S.E.C. investigation of I.C.C.; Sears' testimony before the Grand Jury in the

Mitchell-Stans trial; his testimony at that trial; and testimony before the Morris County Ethics Committee. In addition, there are implied admissions of inaccurate and deliberately falsified testimony in portions of prior testimony which the respondent designated by means of single and double paper clips for the United States attorneys in preparation for the Mitchell-Stans trial. While an extensive review of the conflicting testimony is unwarranted, some general remarks concerning these charges are in order.

Three of the charges against respondent concern testimony about the events of April 10, 1972, on which date respondent (with the I.C.C. president) delivered the secret campaign contribution to Stans, met with Mitchell, and then met with S.E.C. Chairman Casey.[4] With regard to each of the charges, respondent denies a willful intent to testify falsely or to perjure himself and attributes existing discrepancies to other factors. Among these factors are his allegedly depressed state of mind, an inability to accurately

---

[4]Respondent was charged in the thirteeenth, twentieth and twenty-first counts of the Statement of Charges and Presentment with ethical violations relating to false and inconsistent testimony. The thirteenth count is concerned with respondent's testimony about the date of his first meeting with S.E.C. Chairman Casey. The grand jury and trial record reveals that at various times he testified that the relevant date was March 8, 1972, April 10, 1972 and May 11, 1972. The twentieth count charges respondent with giving deliberately misleading testimony concerning John Mitchell's assistance in obtaining an interview for respondent with Chairman Casey on April 10, 1972. Respondent's S.E.C. deposition indicates that such an interview had been possible prior to April 10; at the Mitchell-Stans trial, however, respondent stated that April 10 represented the first opportunity for such a meeting. The twenty-first count considers whether respondent told Mitchell on April 10, 1972, that Sears and the I.C.C. president had delivered a secret campaign contribution to Maurice Stans earlier that day. Before the Grand Jury, respondent testified that the subject of the contribution was never discussed between Mitchell and himself. At trial, however, Sears stated that he had told Mitchell of the impending contribution on February 11, 1972, and as well as the fact of the actual delivery on April 10 when he saw Mitchell that day.

recollect certain events, a failure to review his personal records for inaccuracies, and a refreshed recollection at the later hearings.

While we consider the factor of his deep mental depression elsewhere as a mitigating circumstance, *see* Part III *infra,* we otherwise find his explanation of these inconsistencies to lack sufficient credibility. Our determination is supported to a large extent by the unique circumstances in which respondent was involved on April 10, 1972. On that date, respondent met with three prominent officials — Maurice Stans, John Mitchell and William Casey — on important matters with which he had been vitally concerned for an extended period of time. At each of these meetings, Sears was able to achieve some significant objective. At his meeting with Stans, respondent was finally able to consummate the delivery of the $200,000 campaign contribution. His meeting with Mitchell resulted in respondent's obtaining an interview with Chairman Casey. In his meeting with Casey, respondent was told that the Commission was not in the habit of taking precipitous action and that there would be a thorough review of the staff report. Because of the unique nature of these events, we find respondent's claim of impaired memory to be incredible. Furthermore, the significance of these events and the seriousness of the violations which had been proven, make respondent's alleged failure to review his records or refresh his memory equally unbelievable. Finally, we note that respondent's alleged need for refreshed recollection is undermined by his detailed testimony relating to these charges during earlier hearings at which he testified.

Two other false swearing charges arose from respondent's testimony concerning his November 21, 1972 meeting with Mitchell and the memorandum which was delivered to Sears on that date. In essence, both charges consider whether the two men discussed the ongoing S.E.C. investigation. The first of these, the nineteenth count, concerns inconsistencies between his S.E.C. depositions and his Grand Jury testi-

mony. Respondent claimed in those depositions that the investigation had not been mentioned. Before the Grand Jury, however, respondent stated that the investigation was the principal topic of conversation. The discrepancy, according to respondent, is attributable to his "re-discovery" of the previously discussed memorandum during the course of his Grand Jury testimony. This memorandum, which he had left in a closet in his home, permitted him to refresh his memory about the discussion of November 21. We find that respondent's explanation lacks credibility for two reasons. First, there was a stark contrast between respondent's S.E.C. deposition and what, in fact, appears to have been discussed at the meeting. While we might overlook minor inconsistencies in his testimony concerning the conversation, we find it difficult to accept the major memory lapse which respondent claims to have suffered. Second, there was a relatively insignificant lapse of time between the occurrence of the meeting (November 21, 1972) and the taking of respondent's deposition (February 21, 1973). We accordingly find this charge to be adequately supported.

Our review of the evidence before the Ethics Committee, however, cautions us against sustaining the second charge about the November 21, 1972 meeting. The fifteenth count specifically considers respondent's testimony concerning Mitchell's knowledge of the contents of the memorandum mentioned above which Sears delivered to Mitchell during the meeting. Before the Grand Jury, respondent indicated that Mitchell was familiar with the contents of the memorandum. He contradicted this testimony during the Mitchell-Stans trial when he stated that Mitchell had no such knowledge. We note at the outset the apparent discrepancy is only heightened by the detail with which respondent described Mitchell's reaction to the contents of the memorandum at the earlier Grand Jury hearing. In spite of this, however, we find that the circumstances which surround the possession of the memorandum by respondent negate any inference of willfulness in his conflicting testimony, and make

the existing discrepancies at least understandable. Respondent suggested to the Ethics Committee that his differing testimony resulted from his confusion of the memorandum which he gave to Mitchell on November 21, 1972 with another memorandum. The Committee apparently rejected this explanation because of the physical dissimilarity between the two memoranda. We acknowledge that the November 21, 1972 memorandum which was delivered in a thick red manila envelope containing other papers and reports, is readily distinguishable from the three-page alternative memorandum to which respondent alluded. Nonetheless, we do note that differentiation is not so easy when the actual seven-page memorandum of November 21, 1972 is itself compared with the alternative. This is particularly true when one considers the innumerable reports, memoranda and other papers which respondent handled and read at this time. The problem of recognition for respondent is further complicated by the fact that the November 21, 1972 memorandum was almost exclusively in the possession of Mitchell at their meeting on that date. Consequently, Sears was afforded scant opportunity to familiarize himself with either the contents or appearance of the memorandum. Even when respondent brought the memorandum home with him, he did not examine thoroughly the contents of either the memorandum or the red manila envelope and apparently placed the envelope on a closet shelf where he forgot about it. Finally, even if we were to recognize the physical dissimilarity between the two memoranda, we would be unwilling to regard this basis for the Ethics Committee's determination as probative of respondent's conclusions about John Mitchell's state of knowledge on November 21, 1972. In this regard, we find that discrepancies between his Grand Jury and trial testimony lack the requisite willfulness to sustain an ethics violation against respondent.

The two remaining counts of false swearing concern respondent's testimony about his relationship with Vesco. We find that the allegations in the fourteenth count concerning

respondent's version as to the number of times Vesco requested him to seek the assistance of Mitchell in the S.E.C. investigation to be sustained by the relevant proofs. With regard to the twelfth count, however, we find insufficient evidence to support the charge. This count, which considers respondent's testimony as to whether he reported the delivery of the secret campaign contribution to Vesco, is based on testimonial discrepancies between his appearances before the Grand Jury and at trial. Although it was rejected by the Ethics Committee, we find respondent's claim of refreshed recollection before trial to be credible and readily supportable. While the events of April 10, 1972 may represent significant occurrences within the context of this proceeding, a subsequent oral report to Vesco pales by comparison. This becomes more convincing if one accepts respondent's testimony that his discussion of the delivery with Vesco was not detailed and was perfunctory in nature. Finally, it is understandable that respondent forgot about this discussion in light of the fact that he had been accompanied by the I.C.C. president, Larry Richardson, who could have been expected to make such a report when he returned from Washington — especially when his return preceded that of the respondent by a full day. Accordingly, we find no ethical violation on this count.

### D. *Attempt to Have S.E.C. Subpoenas "Withdrawn"*

The fourth count of the original Statement of Charges alleged that respondent attempted to induce John Mitchell to withdraw, or to secure the withdrawal of the S.E.C. subpoenas issued to I.C.C. and its officers. The Ethics Committee stated that this action was undertaken for the explicit purpose of "hindering, delaying and influencing the investigation." After its hearing, the Committee found the charge to be supported factually and respondent guilty of a violation of DR 1–102(A)(3), (4), (5) and (6), and DR 9–101(C). *See* note 2 *supra*. Respondent contends, to the contrary, that he merely desired a postponement of the

return dates of the subpoenas until after the 1972 national election, when the political overtones of the case would be less glaring.

Regardless of whose interpretation is adopted, it is clear that respondent wanted Mitchell to take some action with regard to the subpoenas. This fact was acknowledged and discussed by Sears at the ethics hearing.

Q. When you communicated with Mr. Mitchell, what was your intention that Mr. Mitchell would do to affect the request that you were making?

A. [Sears] What was my intention that he would do? I don't know that I had a specific intention. I assumed that he would talk, probably talk with either Mr. Casey or somebody. Probably Mr. Casey. I don't know. I really don't know at this point whether I had a specific thought. I was talking to John Mitchell as a man who shared the same concern that I did as far as the President's campaign is concerned, and he was certainly in a position to discuss it with someone. I don't have any recollection of my either saying to him to talk to some specific person or thinking that he would, but I assume — and this is not recollection — I assume that I at that time assumed that he talked to Mr. Casey.

There is proof that Vesco ordered Sears to have the subpoenas quashed or withdrawn. In view of all the foregoing, we conclude that the Ethics Committee adduced clear and convincing evidence in support of its charge that respondent's intent was to request that the subpoenas be quashed. We therefore sustain the Committee's finding in this regard.

### III

#### Conclusion

The applicable standard of proof by which to measure alleged unethical conduct is that of clear and convincing evidence. *In re Rockoff,* 66 *N. J.* 394, 396–97 (1975); *In re Hyett,* 61 *N. J.* 518, 520 (1972); *In re Pennica,* 36 *N. J.* 401, 419 (1963). This high standard emphasizes the reluctance which should characterize a decision to impose

a disciplinary sanction and the serious consequences which attend such a decision. As a practical matter, such a decision limits, if it does not preclude, an attorney's opportunity to practice his chosen profession. We should impose such a restriction only after careful deliberation and only in circumstances which clearly warrant it.

Our review of the record in the instant matter convinces us that sufficient evidence exists to sustain each of the findings of ethical violations by the Morris County Ethics Committee except as heretofore noted. While we are not unmindful of the inferential nature of some of the proofs upon which some of the findings are founded, we nonetheless feel that the evidence of the conduct in question and the background against which it occurred meet the "clear and convincing" standard required to sustain the conclusion of the Ethics Committee.

Therefore, we conclude that the public interest requires that the respondent be disciplined. While we also decide that the discipline should be severe, we feel constrained not to impose the most severe sanction available — disbarment.

We are initially cognizant of the danger that respondent's actions may be inextricably colored by the unfortunate chapter in our Nation's history in which they occurred. The effects of the Watergate crisis have not only awakened a political awareness within the country, but have introduced a new perspective from which to view and evaluate the conduct of public figures. The "post-Watergate morality" emphasizes a new standard by which to measure the propriety of their actions and the accountability of such personages for their conduct. We recognize the salutary effects of this new perspective and welcome it. Nevertheless, our obligation to impose discipline for respondent's ethical violations requires a fair assessment of his conduct apart from the unlawful acts of many national officials. We must guard against using this case as a symbolic protest against the immorality associated with the Watergate affair. *Cf. In re Spritzer*, 63 *N. J.* 532 (1973); *In re Queenan*, 61 *N. J.* 579 (1972).

In the instant matter, we take note of certain extenuating circumstances. As noted above, respondent has enjoyed a long and distinguished career as an attorney and a public servant. Respondent held, at various times, a series of legislative positions for which he received the recognition and acclaim of both his colleagues and the public at large. His active role in public affairs projected respondent as a potential candidate for governor. He also enjoyed a reputation for integrity and veracity as a highly respected attorney in Morris County. The character of his reputation and its enduring nature were evidenced at the ethics hearing in this matter by the testimony of numerous retired judges and members of the Bar. The tenor of such testimony clearly reflects their high esteem for Harry L. Sears, and the witnesses' continued faith in him, despite the transgressions we now consider.

The testimony of these witnesses also reveals the devastating impact which these events have had on respondent. In addition to the trauma of the investigation into his activities, respondent was required to undergo extensive and exhausting debriefing sessions with the United States attorneys. These interviews were not only intended to prepare respondent as a government witness, but had as a collateral purpose the procurement of an admission of guilt from him. With one group of parties actively attempting to undermine his credibility, and another group seeking an admission of guilt, respondent was deprived of virtually all support.

The respondent's resulting state of mental depression is well-documented in the record. Ample testimony exists concerning the manner in which respondent has been changed from a gregarious, vibrant individual to an unresponsive and melancholy one. Furthermore, evidence at the ethics committee hearing indicated that this psychological state severely compromised respondent's ability to function normally. This condition might not only explain some of the lapses of memory which characterized respondent's testimony, but also

his apparent inability to prepare for his appearances before various investigatory tribunals.

In considering the appropriate disciplinary measure, we must also evaluate respondent's character and the likelihood that he will engage in similar activities in the future. "Discipline is generally regarded as non-punitive in its essence. The primary purpose is to protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of attorney and client." *In re Introcaso*, 26 *N. J.* 353, 360 (1958); *In re Logan*, 70 *N. J.* 222, 227 (1976); *In re Loring*, 62 *N. J.* 336, 347–348 (1973). Our attention is drawn to the exemplary professional record which respondent has compiled throughout the years. This record has won him the respect and admiration of his community and his peers. In conjunction with this, respondent has apparently retained the trust of his colleagues and clients despite his unfortunate association with the events discussed herein. We find that this respect is a genuine testimony to the character of Harry L. Sears. Furthermore, we are confident that such an episode will never reoccur.

While current political mores may tend to blur a distinction between ingratiating oneself with a public official by open political and financial support, with the hope and expectation of collateral benefits, and actively bribing such an official for specific favors, that distinction was very real when the events which we now consider occurred and must be recognized as a factor in this case. A more stringent standard would unfairly sacrifice respondent to *ex post facto* popular concepts of acceptable political and ethical behavior. As already noted, the $200,000 contribution involved in this case was but the latest in a series of substantial contributions by Vesco to the Republican Party over the years. There is no charge or proof that respondent intended this contribution as a bribe in return for the promise of subversion of the S.E.C. investigation. He neither received nor asked for any such promise.

We have not had occasion heretofore to consider the subject matter of Watergate and the ensuing investigations. Our present review of respondent's activity should not, of course, be interpreted as approval of such conduct in any way. Rather, we have attempted to review Sears' activity with a sense of fairness and balance bearing in mind that his association with Watergate figures may unduly color our judgment.

■ In final analysis, then, respondent's discipline must be commensurate with the ethical violations for which he has been found guilty. Mitigation for extenuating circumstances is a factor in fixing discipline. Compassion is a permissble element in evaluating a proper response to a given set of facts. We are concerned here only with the single general episode in which respondent failed to discharge his professional responsibility. His transgressions were obviously an aberration. *In re Ackerman,* 63 *N. J.* 242 (1973); *In re Friedland,* 59 *N. J.* 209 (1971). We believe that the facts in this case appropriately suggest that we "be merciful as well as just."

Service upon ethics committees is not an easy assignment and is one which affords no tangible rewards for the investment of time and effort which it requires of committee members. The performance of the Morris County Ethics Committee in the instant case has been most exemplary. Long hours, days, and even weeks were required to listen to and evaluate the evidence. In this matter, the Committee has truly served in the finest tradition of our profession. It conducted 13 meetings over a period of six weeks. We extend our appreciation for its conscientious discharge of a difficult obligation.

■ We observe finally that the judicial role in disciplinary matters demands our utmost sensitivity to the purpose which we serve. We have no great zeal to impose sanctions on individuals for disciplinary infractions. Our foremost concern is to guarantee that members of the bar represent the interests of their clients in keeping with the public trust. Thus, we

must weigh the likelihood of future violations, as well as the seriousness of proven transgressions, in imposing discipline. Such judgments, by their very nature, rest on assessments of individual character. Therefore, we will not subscribe to a policy controlling future cases without knowledge of the facts which may arise in those cases. We previously stated that "each case must rest largely upon its own particular circumstances." *In re Greenberg,* 21 *N. J.* 213, 225 (1956). *See also In re Abrams,* 65 *N. J.* 172, 179 (1974); *In re Baron,* 25 *N. J.* 445, 449 (1957).

Our Court assumes this responsibility because it has been vested with the constitutional obligation to discipline members of the bar who violate our code of professional responsibility. *N. J. Const.* (1947), Art. VI, § II, par. 3; *see* 28 *Rutgers L. Rev.* 707 (1975). The situations requiring our attention are presented to us by the formal charges which are filed by the various ethics committees. The process is most unpleasant — and most delicate — because fellow practitioners are respondents in these proceedings. As United States Supreme Court Justice Brennan, when a member of the New Jersey Supreme Court, said:

> . . . [A]s a former President of the United States has said as to the responsibilities of that office, "The buck stops here"; ours is the final word and when we give it expression we are all too painfully conscious that, stating it, we are often ending a lawyer's career. [*In re Frankel,* 20 *N. J.* 588, 600 (1956).]

Under all the attendant circumstances, we have decided upon a lesser penalty than would otherwise be appropriate were it not for respondent's distinguished history of public service, and unimpeachable probity in the prior practice of his profession. Respondent's privilege to practice law in this State is suspended for three years and until the further order of this Court.

SULLIVAN, J. (concurring and dissenting). I subscribe generally to the majority opinion except as to the extent of

discipline to be imposed. The undisputed facts of this case establish that respondent was a knowing and active participant in an attempt to influence an ongoing Securities and Exchange Commission's (S.E.C.) investigation of financial manipulations involving International Controls Corporation (I.C.C.), a Robert Vesco-controlled enterprise. The investigation had disclosed matters which the S.E.C. staff considered "very serious," including possible perjury on the part of Vesco. A meeting at the office of general counsel of the S.E.C. with I.C.C. personnel in connection with the investigation was characterized by Vesco as a "disaster."[1]

The means employed was a $250,000 campaign contribution by Vesco of which $50,000 was a public contribution through the New Jersey Finance Committee, and $200,000 was a secret cash payment carried to Washington by respondent and Larry Richardson, the president of I.C.C., and delivered to Maurice Stans the Finance Chairman of the Committee to Re-elect the President.

As soon as the money had been delivered, Richardson told Stans that "Mr. Vesco asked me to give you a message. He'd like to get some help." Stans' response was "that is John Mitchell's department."[2] Respondent testified that he immediately protested Richardson's statement, saying that there was no *"quid pro quo"* for the contribution. Nonetheless, it is undisputed that respondent kept a previously made appointment with Mitchell for that afternoon and reported to Mitchell that the contribution from Vesco had been delivered. Respondent also reminded Mitchell of a prior request by respondent for a meeting with Chairman Casey of the Securities and Exchange Commission to discuss the Vesco investigation. Mitchell immediately telephoned Casey's office and

[1] The S.E.C. investigation ultimately disclosed widespread looting by Vesco of more than 224 million dollars of funds belonging to investors.

[2] Mitchell had been Attorney General of the United States and was then Chairman of the Committee to Re-elect the President.

arranged a meeting between respondent and Casey for 4:00 or 4:30 that afternoon.

Respondent testified that at the meeting with Casey he mentioned complaints he had received from I.C.C. personnel about harassment by the S.E.C. staff and fears expressed that the S.E.C. might rubber-stamp the staff report without giving I.C.C. an opportunity "to counter some of the findings that might be made."

Casey told respondent that the Commission was not in the habit of taking precipitous action and that there would be a thorough review of the staff report. However, he did not give respondent "any assurance" that I.C.C. would be allowed to appear before the Commission itself.

Respondent disavows any improper motives on his part. He insists that his meeting with Mitchell and Casey on the same day the $200,000 cash contribution had been made was just a coincidence. However, the events set forth above, and particularly the timing and sequence thereof, clearly implicate respondent in an attempt to influence, by improper means, a S.E.C. fraud investigation. That it was done at almost the highest levels of the federal government, and in a sophisticated manner, does not change its essential nature. Moreover, when the S.E.C., having uncovered the transfer of the $200,000 in cash, issued subpoenas to Vesco and others calling upon them to testify as to where the money went, respondent, at Vesco's urging and in response to Vesco's threat "to blow the lid on the whole thing," again sought Mitchell's influence in an effort to have the subpoenas withdrawn.

Finally, when respondent was called before a grand jury which was investigating the whole matter, he gave testimony which, in many instances, was either false or misleading in an obvious attempt to hide the truth.

Despite respondent's otherwise impeccable record, I cannot excuse his participation in an attempt to "buy" favorable S.E.C. treatment for Vesco, or his subsequent efforts to frustrate or impede the S.E.C. and grand jury investigations of the secret payment. To put it plainly, respondent is

guilty of deliberate attempts to corrupt the processes of government.

Attorneys are held to high standards of honor and moral decency in their professional conduct not only to protect the public but also to the end that public respect for the integrity of the administration of justice will never be doubted. If we are to maintain public confidence in that integrity we must be resolute in our insistence that attorneys maintain the standards we have established. I regard respondent's conduct herein as so pernicious as to demonstrate his unfitness to continue in the practice of law. I vote to disbar.

*For suspension for three years*—Chief Justice HUGHES, Justices PASHMAN and SCHREIBER and Judge CONFORD—4.
*For disbarment*—Justice SULLIVAN—1.

ORDER

It is ORDERED that HARRY L. SEARS of Boonton be suspended from the practice of law for a period of three years and until further order of the Court, effective October 15, 1976; and it is further

ORDERED that HARRY L. SEARS be and hereby is restrained and enjoined from practicing law during the period of his suspension.