402 A.2d 1175.

FRANK A. CARTER, JR., *Chief Disciplinary Counsel,*
*vs.* GIOVANNI FOLCARELLI.

JUNE 20, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J. The respondent, Giovanni Folcarelli (Folcarelli), was licensed to practice law by this court on December 18, 1953. This matter is before us by reason of formal charges against Folcarelli citing violations of our Rule 47, the Code of Professional Responsibility (the code), which were filed by the Chief Disciplinary Counsel with the Disciplinary Board of the Supreme Court of the State of Rhdoe Island (the board). The charges were heard by one of the board's three-member hearing panels. Folcarelli and his attorney were present at the hearing.

The relevant evidence adduced at the hearing was undisputed. The hearing panel made findings and recommendations which, in turn, were adopted by the board. The board has forwarded to us its decision and recommendation. The board recommended public censure after finding that Folcarelli had (1) neglected a legal matter entrusted to him — a violation of DR 6-101(A)(3) — and (2) intentionally prejudiced or damaged his client during the course of a professional relationship — a violation of DR 7-101(A)(3).

Following the receipt of the board's recommendation, we issued a show cause order, directing Folcarelli to appear before us in chambers and to show cause why he should not be disciplined. He appeared before us accompanied by counsel. At that time it was agreed that his counsel would be given the opportunity to file a brief. We acknowledge receipt of the brief.

The record indicates that at approximately 6:45 p.m. on September 10, 1970, Pasquale Forte (Forte) was operating his automobile in Cranston in a northerly direction along Reservoir Avenue. Forte's wife was seated alongside him. When Forte came to the point where Reservoir Avenue intersects Bridgton Road, he came to a stop prior to making a left-hand

turn onto Bridgton. Within a matter of seconds the Forte vehicle was struck in the rear by a second vehicle, which, in turn had been hit from the rear by a third vehicle. Mrs. Forte injured her neck.

The next day Forte contacted Folcarelli, and he agreed to represent Forte and his wife. Forte told the panel that his wife had "tremendous pains" and he had "substantial" medical bills. As Forte received the bills, he forwarded them to Folcarelli. Forte said that sometime in 1971 Folcarelli told him that suit had been commenced. During that year Folcarelli became ill. When Forte heard of his attorney's illness, he spoke to him and suggested that if Folcarelli could not "handle the case," Forte would obtain another attorney. Folcarelli replied: "Don't worry about it, I'll take care of everything." Whenever Forte inquired about the status of the negligence action, he was told by Folcarelli: "It's in [sic] the court docket and you must wait your turn."

With each passing day, domestic tranquility at the Forte household came under a greater strain as the wife began to insist that they find another lawyer because the claims had been pending "too long." When Forte told Folcarelli that the delay in the Superior Court negligence case might lead to a domestic relations proceeding, he agreed to see the Fortes in his office. On May 2, 1975, a long-standing friendship between Forte and Folcarelli came to an end when Folcarelli informed his clients that at one point during his 1971 illness he had turned the Fortes' claim over to a second attorney, who had failed to file suit. The statute of limitations on everything but Forte's $100 property claim had long since expired.

The Fortes then commenced a malpractice action in the Superior Court against Folcarelli. On August 16, 1977, Folcarelli appeared in the office of the Fortes' attorney and gave a sworn deposition, a copy of which was introduced into evidence at the panel's hearing. In his deposition Folcarelli corroborated the testimony given by Forte. He conceded that Forte had contacted him several times with regard to how the case was proceeding. When Folcarelli was asked to

identify the attorney to whom he had referred the Fortes' claim, he refused, saying: "I'm going to die with it." As a deponent Folcarelli insisted that his status reports to the Fortes were based upon the information given to him by the second attorney. He conceded that the only time he ever checked the files in the Superior Court to determine the status of the Fortes' claim was shortly before he broke the bad news to them.

Folcarelli offered no testimony at the hearing. Through counsel he conceded that he had neglected a matter committed to his care. However, in a statement to the panel, he insisted: "I can say one thing, most specifically, and that is, I never, ever intended to harm the Fortes intentionally, wilfully, or otherwise * * *." As the hearing concluded, a panel member, after noting that there was no evidence in the record as to the identity of the second attorney, asked Folcarelli's counsel if the record was to contain that gap. Following a pause during which counsel obviously consulted with his client, Folcarelli's counsel observed: "With the information that's contained in the deposition, we'll let the record stand as it is."

When Folcarelli appeared before us, his sole dispute was with the board's finding that he had violated DR 7-101(A)(3)'s mandate that "[a] lawyer shall not intentionally * * * [p]rejudice or damage his client during the course of the professional relationship * * *." He vigorously argued that there was no evidence to support such a finding.

Folcarelli's reference to the lack of evidence presented at the hearing confronts us with a question as to just what should be the applicable standard of proof by which unethical conduct should be measured. The board, acting pursuant to the terms of our Rule 42-4(c)(4), has adopted rules of procedure. The board's Rule 1.2 describes its proceedings as being "neither civil or [nor] criminal in nature but * * * quasi-judicial administrative proceedings." Whatever the board's verbiage, a decision by the board to recommend the imposition of a public disciplinary sanction

carries with it serious implications for the attorney who is the subject of the recommendation. As a practical matter, the recommendation, if adopted, may limit, if not preclude, an individual's opportunity to practice his or her chosen profession. The recommendation leading to such a result should come only after careful deliberation and only in instances that warrant such a recommendation. Consequently, the standard to be applied by the board in its consideration of the evidence is that proof of unprofessional or unethical conduct must be established by clear and convincing evidence. *See In re Sears*, 71 N.J. 175, 197-98, 364 A.2d 777, 788-89 (1976).

In its decision the board acknowledged that the "intentional" charge presented a "more difficult" issue. The board's affirmative finding came after it had referred to the "high decree of responsibility owed by an attorney to his client" and measured that duty against Folcarelli's failure to check on the veracity of his co-counsel's reports before he told the Fortes that their claims were into litigation. In employing this approach, the board erred.

We take the words of the code as they are written. DR 6-101(A)(3) speaks of "[n]eglect," while DR 7-101(A) uses the term "intentionally." Canon 7 of the code stipulates that a lawyer should "represent a client zealously within the bounds of the law." The ethical considerations dealing with this duty are couched in magnificent rhetoric and remind the attorney that he "should exert his best efforts"[1] and "should always act in a manner consistent with the best interests of his client."[2] DR 7-101(A)(1) and (2) are phrased in terms that prohibit an attorney's intentional failure either to "seek the lawful objectives of his client through reasonably available means permitted by law" or "carry out a contract of employment entered into with a client for professional services." When one compares the language of DR 7-101(A) and (2), which

---

[1] Code of Professional Responsibility for the State of Rhode Island, EC 7-8.

[2] *Id.* EC7-9.

says that "[a] lawyer shall not intentionally * * * [p]rejudice or damage his client," is obvious that there must be clear and convincing evidence in this record which would support an inference that Folcarelli, in his conversations with the Fortes, was deliberately misrepresenting the status of their claims. However, the board at no time gave any indication that it believed Folcarelli was anything less than truthful when in his deposition he swore that the information he gave the Fortes was based solely on the reports given him by the second attorney. Consequently, we must vacate the board's finding of intentional prejudice or damage.

The only issue to be resolved deals with the sanction to be imposed.

We have informed the board that its finding as to DR 7-101(A)(3) lacked the requisite evidentiary support and asked the board what effect, if any, this finding might have on its recommendation of public censure. The board has informed us that it still adheres to its original recommendation.

Although we accord great weight to the board's recommendation, the ultimate responsibility in this area is ours. The primary purpose of discipline is not punishment; it is the protection of the public and those charged with the administration of justice. *In re Levin*, 116 R.I. 949, 951, 359 A.2d 360, 362 (1976). However, discipline also serves to deter the respondent from committing similar acts in the future and acts as a restraining influence on others. *State ex rel. Oklahoma Bar Association* v. *Hall*, 567 P.2d 975, 978 (Okla. 1977). In determining the appropriate disciplinary sanction, several factors are taken into consideration, including the respondent's candor, contrition, and cooperation at the hearings. *In re Dedman*, 17 Cal. 3d 229, 234, 550 P.2d 1040, 1043, 130 Cal. Rptr. 504, 507 (1976).

When Folcarelli appeared before us, his cooperation left much to be desired. Efforts of members of this court to have him disclose the identity of the second attorney were totally unsuccessful. While Folcarelli acknowledged that the public

interest could be served by telling us the name of the forgetful attorney, he remained steadfast in his determination to do nothing that would enable us to determine who was the second attorney. Such at attitude cannot be countenanced. At this point no one will ever know whether Folcarelli's correspondent's lapse of memory is a chronic condition that should be remedied before other members of the community join company with the Fortes. Folcarelli's failure to cooperate with us in the investigation of his own misconduct justifies a harsher punishment that might otherwise have been imposed. Hopefully, our endorsement of the board's recommendation will serve notice to the members of the Bar that cooperation with this court in its efforts to protect the public in its dealings with the legal profession is demanded and expected.

We are cognizant of the view expressed by other members of the court that, by calling for public censure, we are punishing Folcarelli for something for which he has not been charged. Concededly, some might argue that Folcarelli should not be charged with violating DR 1-103(B). This provision of the code requires a lawyer who possesses unprivileged information about another lawyer to divulge that information upon a proper request of a tribunal empowered to investigate or act upon the conduct of lawyers.

Due process as applied to disciplinary proceedings involving an attorney requires notice of the charge and an opportunity to be heard. *In re Ruffalo*, 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968). However, the Court did refer to an exception which is pertinent to the controversy before us when it observed:

> "It was said in *Randall* v. *Brigham*, 7 Wall. 523, at 540, that when proceedings for disbarment are '*not taken for matters occurring in open court, in the presence of the judges,* notice should be given to the attorney of the charges made and opportunity afforded him for explanation and defense.' " (Emphasis added.]

*Id.* at 550, 88 S. Ct. at 1226, 20 L. Ed. 2d at 122. Summary judicial disciplinary action is appropriate when the attorney's dereliction occurs in a matter then pending before the court and when the facts underlying the dereliction are not in dispute. *Matter of Hunoval,* 294 N.C. 740, 247 S.E.2d 230 (1977). Therefore, even assuming that Folcarelli's refusal to disclose to us is a violation of DR 1-103(B), this refusal certainly came in open court in the presence of the judges. Furthermore, notice of the charge would add nothing. It was obvious, then, as it is obvious now, that, no matter what, Folcarelli wishes to assume sole responsibility for the default of his fellow attorney.

Accordingly, the respondent, Giovanni Folcarelli, is hereby publicly censured for his inattention to the needs of his clients and his failure to cooperate with this court.

Mr. Justice Joslin, with whom Mr. Chief Justice Bevilacqua, joins, dissenting. By his own admission, Folcarelli neglected a legal matter that was entrusted to him. He is punished by the majority, however, not only for that neglect, but also because he refused to divulge to us, as he had refused to divulge to the Disciplinary Board, the identity of the attorney to whom he had referred the matter.

In disciplinary proceedings an attorney is entitled to procedural due process. *In re Ruffalo,* 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968). Thus, at the very least, he should receive reasonable notice of the charge against him and an opportunity to be heard in his own defense. *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 22 L. Ed. 205 (1873); *see In re Oliver,* 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948). Folcarelli did not receive such notice nor opportunity to be heard with respect to the charge of refusing to reveal the name of the second attorney. The punishment imposed by the majority is in part for that refusal.

The majority contends that Folcarelli may be punished for a disciplinary violation despite his lack of notice of the charge. To support that proposition, they rely on the United States Supreme Court case of *Randall* v. *Brigham,* 74 U.S. (7

Wall.) 523, 19 L. Ed. 285 (1868), that was cited in *In re Ruffalo*. They conclude that notice and an opportunity to be heard are not required before disciplining an attorney for those "matters occurring in open court, in the presence of judges."[1] I disagree with the majority's application of *Randall* to the circumstances here.

Clearly, courts have power to punish any disruptive or disrespectful conduct summarily and without notice of hearing when it occurs in open court in view of the judge. *See In re Oliver*, 333 U.S. at 275-76, 68 S. Ct. at 509, 92 L. Ed. at 695. In that kind of situation, immediate punishment is essential to prevent a public degradation of the court's authority. In effect, the power there being exercised is derived from the power to punish for contempt.[2] Except in a narrowly limited category of contempts, however, due process requirements may not be ignored. *In re Oliver*, 333 U.S. at 275-76, 68 S. Ct. at 508-09, 92 L. Ed. at 695; *State* v. *Costantino*, 107 R.I. 215, 219, 266 A.2d 33, 35 (1970).

In this case, however, Folcarelli was not charged with contempt, nor did he disrupt the proceedings. Furthermore,

---

[1]To the extent that a *Randall* exception does exist, it seems clear that, although notice to the errant attorney may not be required, a hearing is still mandatory. This was the position taken by Mr. Justice Field, the author of *Randall*, in the later case of *Ex parte Robinson*, where he said, speaking for the Court:

> "There may be cases undoubtedly of such gross and outrageous conduct in open court on the part of the attorney, as to justify very summary proceedings for his suspension or removal from office; but even then he should be heard before he is condemned." 86 U.S. (19 Wall.) at 513, 22 L.Ed. at 208.

The difficulty in describing a *Randall* situation was discussed in *In re Los Angeles County Pioneer Society*, 217 F.2d 190, 195 (Chambers, J., concurring) (1954):

> "Most of the cases on 'off the handle' disbarment carefully recognize that there is an inherent power to disbar an attorney in a proper case, without notice or any other formality, but the cases neglect to describe a 'proper case.' Randall v. Brigham, 7 Wall. 523, 74 U.S. 523, 19 L. Ed. 285; In re Claiborne, 1 Cir., 119 F.2d 647. Venturing into the unknown, I suggest that if [an attorney] had come into court with six-guns at his side and with fingers on triggers demanded that a district judge sign an order, the district judge would have power then and there without formality to disbar [the attorney]."

[2]It is derived as well from the court's inherent power to discipline attorneys.

the proceedings were in chambers rather than in open court, and the court's authority was not in danger of being denigrated in the eyes of the public. Folcarelli was unaware that his refusal to divulge the name of his fellow attorney would provoke a stiffer sanction. Indeed, his first knowledge of that will come with the publication of this opinion.

Despite Folcarelli's adamant refusal to identify the forgetful attorney, we will never know what he would have done if charged with a violation of DR 1-103 for failing to comply with our request. It may well be that, had he known that a guilty finding on that charge would precipitate a more severe sanction than we have ever imposed on an attorney for missing a statute of limitations, he would have been dissuaded from persisting in this attitude that "I'm going to die with it [the identity of the attorney]." Fair play demands that he should have been given an opportunity to make that choice. Absent that opportunity he should be punished only for neglecting to comply with the statute of limitations and for that offense I would not vote for anything beyond a private censure.

*Frank A. Carter, Jr.,* pro se, for petitioner.

*Gerard P. Cobeligh,* for respondent.