Mary M. LISI, Chief Disciplinary Counsel

v.

SEVERAL ATTORNEYS.

No. 91–338–M.P.

Supreme Court of Rhode Island.

July 26, 1991.

Mary M. Lisi, Chief Disciplinary Counsel, pro se.

Steven Fortunato, Warwick, for James D. Levitt.

Joseph A. Kelly, Providence, for N. Jameson Chace.

John Tramonti, Jr., Providence, for Stephen A. Gordon.

Thomas J. Liguori, Jr., Westerly, for George A. Comolli.

## OPINION

SHEA, Justice.

These disciplinary matters are before the Supreme Court pursuant to Rule 42–6(b) of the Supreme Court Rules.[1] The Disciplinary Board of the Supreme Court (disciplinary board) voted to recommend sanctions against the respondent attorneys following full disciplinary hearings in each case. Even though each respondent attorney has come before this court separately pursuant to our order to appear and show cause why he or she should not be disciplined, we have, on our own motion, consolidated the cases to consider in one opinion the common issues raised by all these cases.

This court learned of the events that gave rise to these petitions on August 23, 1989. On that date the Chief Judge of the Family Court forwarded a letter to the Chief Justice advising him that John E. Fuyat (Fuyat), then an associate justice of the Family Court, had committed himself to a hospital for treatment for a period of thirty days. Fuyat had not been on the bench after July 10, 1989. Further discussion with the Chief Judge disclosed that information had come to him that Fuyat may have been involved in obtaining loans of money from several attorneys. By letter of August 25, 1989, the Chief Justice, after conferring with the other members of this court, directed that Fuyat be relieved of all judicial duties pending completion of an investigation by the Commission on Judicial Tenure and Discipline, which was subsequently asked to look into the entire matter.[2] This court also directed the office of the Disciplinary Counsel of the Supreme Court (disciplinary counsel) to look into the allegations that Fuyat had obtained loans of money from several attorneys.

In fairly short order, on September 25, 1989, Fuyat resigned from his position as associate justice of the Family Court. On December 22, 1990, the chief disciplinary counsel filed with the clerk of this court a petition for disciplinary action against Fuyat in his capacity as an attorney licensed to practice law in this state. That petition relied upon complaints of incidents wherein Fuyat solicited substantial loans of money from attorneys, some, but not all, of whom practiced in the Family Court. In due course Fuyat, through counsel, filed with the disciplinary board an affidavit in which he consented to disbarment. We ordered his disbarment as is required of us under Rule 42–13(b) of the Supreme Court Rules. In doing so, this court observed that Fuyat's consent to disbarment was tantamount to a plea of nolo contendere in a criminal matter, and the consent constituted an admission that he did, in fact, engage in the conduct with which he was charged. *Carter v. Fuyat,* 571 A.2d 1126, 1126–27 (R.I.1990).

This court was later petitioned by the Commission on Judicial Tenure and Discipline (commission) for advice on whether the commission continued to have jurisdiction over a judge who had resigned before the commission had issued a notice of public hearing under § 8–16–4(c). The commission was specifically uncertain of its jurisdiction over Fuyat because the charges set forth against him in the proposed notice related to conduct that occurred solely during Fuyat's judicial tenure. We held that the commission continued to have jurisdiction over a resigned or retired judge because the commission had the power to impose sanctions other than removal from office. *In re Fuyat,* 578 A.2d 1387, 1389 (R.I.1990). However, in Fuyat's case, he had not only been removed from office but had also been disbarred. Since he had ad-

---

1. The complaints were originally filed in the name of Frank A. Carter, Jr., who has retired as disciplinary counsel. We have substituted the name of his successor as disciplinary counsel, Mary M. Lisi.

2. The Commission on Judicial Tenure and Discipline is composed of fourteen members that have the authority under G.L.1956 (1985 Reenactment) § 8–16–1 to investigate judicial misconduct and competence.

mitted the charges made against him in a parallel proceeding, no useful purpose could be accomplished in an evidentiary proceeding before the commission. *Id.* Furthermore, because the disciplinary counsel and staff were then engaged in hearings on complaints against the individual attorneys, which hearings must be confidential under Supreme Court Rule 42–21 until public sanctions are imposed by this court, any hearing against Fuyat that publicly implicated the attorneys would violate their rights of confidentiality under the Rule. 578 A.2d at 1389.

After investigation the disciplinary board authorized the filing of petitions for disciplinary action against the attorneys who were alleged to have lent money to Fuyat. The disciplinary board worked diligently for over a year after receiving the complaints and the investigative reports. Separate hearings were conducted in each case before three member panels of the disciplinary board wherein due-process rights were fully afforded to each attorney. Thereafter, the full disciplinary board reviewed each case before final decisions were reached and recommendations to this court were decided upon. In regard to two of the attorneys, since one of them was the immediate past chairman of the disciplinary board, a special hearing board was convened to address the complaints against that attorney and his law partner who was also the subject of a complaint.

The disciplinary board considered some of the charges under the old Disciplinary Rules of the Code of Professional Responsibility that were in effect until November 15, 1988, because some of the alleged violations occurred prior to that date. The Rules under the prior code that were alleged to have been violated were as follows:

"DR 1–102. Misconduct.—(A) A lawyer shall not:

\* \* \* \* \* \*

(5) Engage in conduct that is prejudicial to the administration of justice."

"DR 1–103. Disclosure of Information to Authorities. (A)—A lawyer possessing unprivileged knowledge of a violation of DR 1–102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation."

"DR 7–110. Contact With Officials.— (A) A lawyer shall not give or lend any thing of value to a judge, official, or employee of a tribunal."

"DR 9–102. Preserving Identity of Funds and Property of a Client.—(A) All funds of clients paid to a lawyer or law firm other than advances for costs and expenses, shall be deposited in one or more identifiable accounts in financial institutions \* \* \* and no funds belonging to the lawyer or law firm shall be deposited therein \* \* \* ."

Other charges were considered under the new Rules of Professional Conduct that became effective November 15, 1988, replacing the Code of Professional Responsibility. The Rules of the new code alleged to have been violated were as follows:

"Rule 1.16. Declining or Terminating Representation.—(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1) the representation will result in violation of the rules of professional conduct or other law."

"Rule 3.5. Impartiality and Decorum of the Tribunal.—A lawyer shall not:

(a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;

\* \* \* \* \* \*

(c) engage in conduct intended to disrupt a tribunal."

"Rule 8.3. Reporting Professional Misconduct.—(a) A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

(b) A lawyer having knowledge that a judge has committed a violation of appli-

cable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority.

(c) This rule does not require disclosure of information otherwise protected by Rule 1.6."

"Rule 8.4. Misconduct.-It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

(d) engage in conduct that is prejudicial to the administration of justice, including but not limited to harmful or discriminatory treatment of litigants, jurors, witnesses, lawyers, and others based on race, nationality, or sex;

\* \* \* \* \* \*

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law."

Finally the Canon of Judicial Ethics that applied to Fuyat in all cases was this:

"21. Gifts and Favors.-(A) Neither a judge nor a member of the judge's family residing in the judge's household should accept a gift, bequest, favor or loan from litigants, or from lawyers or from others whose interests are likely to be submitted to the judge for judgment."

The Canon of Judicial Ethics 21(A) is consistent with Disciplinary Rule DR 7-110(A) and Rule 8.4(f) since it prohibits a judge from accepting a gift, bequest, loan, or favor from any attorney, just as DR 7-110(A) prohibits an attorney from giving or lending anything of value to a judge and Rule 8.4(f) provides that assisting a judge in conduct that violates the Rules constitutes misconduct. We approve of and affirm the disciplinary board's determination that the Rules of Professional Conduct now in force did not lessen but rather strengthened the proscription of the activity that brought about these charges.

Rule 42-6(d) of the Supreme Court Rules states the following concerning our review of the disciplinary board's recommendations:

"*Review by this Court.*—If the [disciplinary] Board determines that a proceeding should be dismissed, or that it should be concluded by private censure, public censure, suspension or disbarment, it shall submit its findings and recommendations, together with the entire record, to this Court. This Court shall review the record and enter an appropriate order. Proceedings, if any, before this Court shall be conducted by [the Disciplinary] Counsel."

We have consistently observed the policy that great weight is afforded to the decisions of the disciplinary board. *Carter v. Folcarelli*, 121 R.I. 667, 402 A.2d 1175 (1979). "The primary purpose of discipline is not punishment; it is the protection of the public and those charged with the administration of justice." *Id.* at 672, 402 A.2d at 1178; *In re Levin*, 116 R.I. 949, 951, 359 A.2d 360, 362 (1976). The ultimate responsibility for the imposition of sanction, however, is ours.[3]

The record before us discloses that between October 1985 and July 1989 Fuyat obtained money, usually in the form of loans, from attorneys licensed to practice in this state. Some of respondent attorneys practiced regularly before the Family Court while others did so infrequently or not at all. It is important to note that in none of these cases did the evidence show an attorney offering money to Fuyat as a sitting judge. Rather in each case the solicitation of money was made by Fuyat. Moreover, no evidence demonstrates or even suggests that any of the attorneys planned to influence Fuyat by acceding to his requests. Most of the attorneys acted out of sympathy and/or friendship; they complied with Fuyat's urgent requests in order to avoid Fuyat's being subjected to

---

**3.** We append to this opinion portions of the disciplinary board's transmittal letter to this court and also the General Memorandum used by the board in its deliberations. The appendices serve two purposes. They will supplement the individual decisions rendered by the board, which decisions will become available to the public with our publishing of this opinion. They will also show the careful and thorough consideration that the disciplinary board gave to the adjudication of the complaints against the various respondent attorneys.

the public embarrassment that the judge represented as imminent. One or two attorneys stated candidly that fear of retribution by Fuyat if the loan was not made was a motivating factor in acceding to his request. In this respect we must recognize, in all fairness to the respondents, that these events happened at a time when Fuyat was a respected sitting judge of the Family Court ostensibly performing the duties of his office adequately.

It is also important to note that some of the attorneys had a personal relationship with Fuyat that extended beyond the relationship of attorney-judge. Three of the attorneys who lent money to Fuyat were close friends with Fuyat and maintained longstanding family relationships between the judge's family and their own. They acknowledged that they would have lent money to Fuyat regardless of his judicial position. However, none of these three attorneys practiced in the Family Court, and the disciplinary board dismissed the charges against them. Many of the other attorneys who lent money to Fuyat knew the judge from their association in college and/or law school. Still others were familiar with Fuyat from his tenure at the State House as an aide to the Senate Majority Leader.

Against this background, after reviewing the facts in each case, we find it impossible to ignore the similarities in the numerous transactions wherein Fuyat obtained loans of money from the attorneys. In the great majority of instances when loans were made, Fuyat would, in exchange, give the attorney his personal check for the amount lent, or with the amount left blank, with the instruction to hold the check for a brief period until his anticipated funds were received so that Fuyat's check would be honored by his bank. In some instances a promissory note was signed. Fuyat would give the attorneys a variety of reasons why he needed the money immediately and could not wait for his anticipated funds. He frequently informed the attorneys that he had a tuition bill due for one of his children. Fuyat also gave numerous other reasons, including that his wife was ill and needed a back operation, that his foster children required psychiatric help, that a real estate closing on property he owned had been delayed, and that he needed a short-term loan and could not go to a bank because he did not want his wife to know about the loan.

Two transactions were alleged by Fuyat to be real estate investments and another was a "swing loan" arranged by an attorney and his partner who was a shareholder in a real estate development corporation owned by his family. Those investments and the swing loan were repaid eventually after some agitation on the part of the attorneys.

It is deserving of mention that none of these attorneys had any reason to believe that he was only one of a large number of attorneys who had been preyed upon by Fuyat. Each attorney kept Fuyat's confidence in order not to embarrass the judge. Thus, Fuyat's predilection for borrowing money was not a topic of general conversation around the courthouse or anywhere else until after the entire situation became public knowledge.

We also emphasize that in almost every instance each attorney successfully avoided appearing before Fuyat after the loan had been made except to answer a calendar call, to continue a case, or to have a case transferred to another judge's calendar. In the aftermath of these events an overview of Fuyat's operations reveals that avoiding a hearing on the merits before Fuyat was apparently not difficult since he rarely conducted hearings in contested cases. After a daily calendar call Fuyat would retreat to his chambers and confer endlessly with attorneys, urging them to resolve their differences. His most frequent judicial function appears to have been to assume the bench and conclude cases as "nominal" contests, that is, judicially ordering the terms to which the parties and their attorneys had already agreed. There was one exception to this rule in that one attorney was in the process of trying a contested case before Fuyat

when he and his partner made loans to Fuyat.

The matters presented to the disciplinary board and to this court represent cases of first impression. We have never previously been called upon to consider disciplining attorneys for this type of violation. Therefore, this court, as did the disciplinary board, will look to the experience of other jurisdictions that have addressed similar situations.

We have also not previously been called upon to consider the Rules of Professional Conduct that became effective on November 15, 1988. As we do so now, we conclude that the provisions of these new regulations, when read together with their accompanying commentaries, set forth purposes and require standards of conduct virtually identical with those of the former Code of Professional Responsibility and the case law that had developed thereunder. It does appear, however, that at least one different emphasis exists in the new rules, in that there is a much stronger emphasis in our present Rules of Professional Conduct regarding the duty to report to appropriate authorities misconduct of which the attorney has knowledge. For this reason the disciplinary board made findings concerning the failure to report ethical misconduct in situations in which it was appropriate to do so involving activity that occurred after November 15, 1988.

In looking to other states for guidance, we note that one state, Illinois, has had numerous opportunities to publish opinions dealing with the requirements and breaches of the provisions of the Disciplinary Rules, principally DR 7–110(A) and DR 1–102(A)(5). The Illinois Supreme Court reasoned that any attorney who gives a loan or anything of value to a judge, even with an honest intent and motive, prejudices the administration of justice by giving the appearance of compromising the impartiality that is the *sine qua non* of our system of justice. Applying this reasoning, the Illinois Supreme Court imposed a one-year suspension on an attorney who personally lent $2,500 to a judge for campaign expenses.[4] Such loans in jurisdictions where judges are elected must be made to campaign committees. The Illinois Supreme Court also applied this reasoning to disbar an attorney for persuading a client with a pending matter before a judge to put up collateral so that the judge could obtain a bank loan, even though the judge was unaware of the identity of his benefactor.[5]

Similarly the New York Supreme Court imposed a public censure on attorneys who were found to violate DR 7–110(A) by paying for a weekend stay at a resort for a judge and his wife.[6] The court considered as mitigating factors the longstanding relationship between the attorneys and the judge and the lack of evidence suggesting that attorneys intended to influence the judge.

The Minnesota Supreme Court also imposed a public censure when two attorneys lent money to a judge before whom they practiced.[7] Although this discipline was imposed under a canon of ethics that provided " '[a] lawyer * * * deserves rebuke and denunciation for any device or attempt to gain from a Judge special personal consideration or favor,' " *In re Litman*, 272 N.W.2d 264, 265 (Minn.1978), the court stressed:

> "In censuring respondents, it should be understood that this form of limited censure will not be adequate for future violations of DR 7–110(A). The grave threats to the integrity of our adversary system of justice which such violations pose surely cannot be tolerated by an honorable profession." 272 N.W.2d at 267.

---

4. *In re Lane*, 127 Ill.2d 90, 129 Ill.Dec. 101, 535 N.E.2d 866 (1989).

5. *In re Powell*, 126 Ill.2d 15, 127 Ill.Dec. 749, 533 N.E.2d 831 (1988).

6. *Matter of Garson*, 98 A.D.2d 581, 471 N.Y.S.2d 331 (1984); *Matter of Gerber*, 98 A.D.2d 593, 471 N.Y.S.2d 610 (1984).

7. *In re Litman*, 272 N.W.2d 264 (Minn.1978).

Finally, the Illinois Supreme Court imposed a public censure when an attorney who had been a long-time friend of a judge arranged seven bank loans of $5,000 each for the judge and later asked a friend to arrange such a loan.[8] In imposing this public censure, the Illinois Supreme Court recognized that the attorney was unlikely to appear before the judge when the loans were arranged, although the attorney did handle one randomly assigned pro-bono case before the judge without advising opposing counsel of his financial relationship with the judge. The case was settled before trial.

■ It is clear from a review of these and many other cases that each case must be considered individually by the disciplinary board. Moreover, when the disciplinary board concludes that a violation has occurred, it is appropriate to consider aggravating and mitigating factors if they exist. Some of the factors that the disciplinary board appropriately considered lead to the following questions:

Did the attorney involved have an opportunity to receive a favor from the judge?

Did the respondent or his law firm appear before the Family Court, and if so, how frequently?

Did the attorney ever notify opposing counsel or otherwise disclose the loan or exchange of checks?

Did the attorney do anything in an effort to collect the funds from the judge?

Can a reasonable inference be drawn that the attorney expected or hoped for favors by forebearing efforts to recover the money?

Was there a particular relationship between the attorney and the judge that would lead one to believe that the transaction, loan, or investment was something that occurred between friends regardless of their status as attorney and judge?

Do the facts lead to a reasonable inference that the attorney was not seeking to influence a matter then before or soon to come before that court?

After the request by the judge, what action did the attorney take—was a report made to the authorities? Was there cooperation with the disciplinary counsel? Did the attorney come forward voluntarily or wait to be summoned after disciplinary counsel discovered his or her complicity?

Did the respondent attorney have any prior disciplinary record that would indicate a lack of regard for the Rules of Ethics?

We have carefully examined the transcripts of the disciplinary board hearings as well as its recommendations, and we have come to the conclusion that its findings and recommendations are not unreasonable. It is regrettable that these members of the bar, none of whom have any prior record of ethical violations and many of whom have contributed countless hours of voluntary service to the courts of this state as well as to the bar as a whole, should be before this court in their present posture.

Although each member of this court has recognized that the admitted activity of these attorneys is, in fact, an ethical violation, we are also aware of the fact that each attorney was singled out by Fuyat and artfully coerced.

Nevertheless, as we stated earlier, our purpose in these disciplinary matters is not primarily punishment, but the protection of the public interest. Part of that interest is the restoration of public confidence in the integrity of the bar and its relationship with the judiciary.

For all these reasons we impose the following sanctions. In doing so, we also disclose the identities of the attorneys for whom public censure or suspension is recommended:

---

8. *In re Weinstein*, 131 Ill.2d 261, 137 Ill.Dec. 72, 545 N.E.2d 725 (1989).

| Attorney | Sanction Imposed |
|---|---|
| John J. Canham | Public Censure |
| William Y. Chaika | Public Censure |
| Richard P. D'Addario | Public Censure |
| Michael B. Forte | Public Censure |
| Michael F. Horan | Public Censure |
| John J. Kelly | Public Censure |
| Francis T. Lenihan | Public Censure |
| Francis T. Little, Jr. | Public Censure |
| John D. Lynch | Public Censure |
| Kenneth J. Macksoud | Public Censure |
| Thomas L. McDonald | Public Censure |
| John P. McGuirl | Public Censure |
| Pat Nero | Public Censure |
| Edward H. Newman | Public Censure |
| Robert M. Silva | Public Censure |
| Eugene F. Toro | Public Censure |
| John P. Toscano, Jr., | Public Censure |
| | |
| Stephen A. Gordon | Suspension (Separate Order Entered) |
| James D. Levitt | Suspension (Separate Order Entered) |
| George A. Comolli | Suspension (Separate Order Entered) |
| N. Jameson Chace | Suspension (Separate Order Entered) |

---

In the proceedings that gave rise to this opinion, other dispositions by way of admonition, private censure, and dismissal of the complaint were decided upon by the disciplinary board. Under Rule 42–21 the attorneys involved will not be identified.

FAY, C.J., and KELLEHER, J., concurring.

## ORDER

### (James D. Levitt)

██ By opinion of this court rendered in the above captioned case, issued pursuant to Rule 42–6(d) of the Supreme Court Rules, the findings and recommendations of the Disciplinary Board for sanctions concerning the respondent James D. Levitt were approved and adopted. In this case respondent attorney was found to have violated Disciplinary Rule 9–102(A) and Rules of Professional Conduct 1.16(a) and 8.4(d) by commingling funds, by representing a judge in a legal matter while his partner was conducting a trial before that judge and by not objecting to a loan to a judge by a company in which the respondent had a financial interest.

Therefore, respondent James D. Levitt is suspended from the practice of law in this state for a period of not less than six (6) months commencing on the first day of September 1991. The respondent may not apply for readmission to practice before March 1, 1992, and will be required at that time to prove to the satisfaction of the Disciplinary Counsel that he has complied in all respects with the requirements of this order.

The respondent is directed to fully comply with the requirements of Rule 42–15 of the Supreme Court Rules regarding notification of the Clerk and to Clients.

## ORDER

### (Stephen A. Gordon)

██ By opinion of this court rendered in the above captioned case, issued pursuant to Rule 42–6(d) of the Supreme Court Rules, the findings and recommendations of the Disciplinary Board for sanctions concerning the respondent Stephen A. Gordon were approved and adopted. In this case the respondent was found to have violated Disciplinary Rules 7–110(A), 1–102(A)(5), 1–103(A), 9–102(A) and the Rules of Professional Conduct 8.4(d), 1.16(a), by exchang-

ing checks, arranging for loans, failing to report as required by DR 1–103(A), by commingling funds, and by referring a judge to his law partner for legal services while respondent had a matter in trial before the judge.

Therefore, respondent Stephen A. Gordon is suspended from the practice of law in this state for a period of not less than one (1) year commencing on the first day of September, 1991. The respondent may not apply for readmission to practice before September 1, 1992 and will be required at that time to prove to the satisfaction of the Disciplinary Counsel that he has complied in all respects with this order.

The respondent is directed to fully comply with the requirements of Rule 42–15 of the Supreme Court Rules regarding notification of the Clerk and to Clients.

## ORDER

### (George A. Comolli)

■ By opinion of this Court rendered in the above captioned case issued pursuant to Rule 42–6(d) of the Supreme Court Rules, the findings and recommendations of the Disciplinary Board for sanctions concerning respondent George A. Comolli were approved and adopted. In this case the respondent attorney was found to have violated Disciplinary Rules 7–110(A), 1–102(A), 1–102(A)(5), and 1–102(A)(4) by engaging in an exchange of checks on two occasions which were actually loans, then failing to cooperate by being less than candid when questioned by Disciplinary Counsel regarding the means by which the loans were repaid.

Therefore, respondent George A. Comolli is suspended from the practice of law in this state for a period of thirty (30) days commencing on September 1, 1991.

The respondent is directed to fully comply with the requirements of Rule 42–15 of the Supreme Court Rules.

## ORDER

### (N. Jameson Chace)

■ By opinion of this Court rendered on the above captioned case pursuant to Rule 42–6(d) of the Supreme Court Rules, the findings and recommendations of the Disciplinary Board for sanction concerning respondent N. Jameson Chace were approved and adopted. In this case the respondent attorney was found to have violated Disciplinary Rules DR 7–110(A), DR 1–102(A)(5) and DR 1–102(A)(2) by facilitating arrangements for a loan from a family business to a judge before whom his firm had and continued to have a domestic relations practice handled by attorneys from his firm.

Therefore, N. Jameson Chace is suspended from the practice of law in this state effective the first day of September 1991 for a period of thirty (30) days.

The respondent is directed to fully comply with the requirements set forth in Rule 42–15 of the Supreme Court Rules.

## APPENDIX I

The following is the transmittal letter referenced in footnote 3, with minor editing, that the disciplinary board sent to this court:

This transmittal marks the end of a task which the Board undertook over a year ago when Complaint investigation reports were first submitted for our consideration. Hearings on these matters were conducted before panels of the Board until January of 1991, and thereafter, the Board as a whole reviewed, considered, debated, and ultimately agreed on the issues presented.

The following will hopefully assist in the Court's work on these matters by providing some insight into the Board's analyses. As the Court will inevitably note, with few exceptions, the factual scenarios in these cases were strikingly similar. The rules involved were basically the same as was the interpretation thereof as agreed upon by the Board. In each case, the primary charge levied was a violation of the proscription against giving or lending anything of value to a Judge as it existed under the Disciplinary Code in effect prior to November 15, 1988, and as it exists in the Rules of

Professional Conduct adopted thereafter. Other charges involved engaging in conduct prejudicial to the administration of justice, etc., and failing to report. In light of the inevitable repetition which a separate legal analysis within the body of each decision would have entailed and, further, in line with our effort to ensure consistency of application in all of the cases, the Board prepared a General Memorandum [*see infra* ]. This sets forth the rules involved and our decision on their interpretation and proper application in these matters. It is incorporated by reference in each decision considered and presented to you by the Board.

In determining whether or not the facts constituted a violation of the rules charged in a given case, because of the change in the rules governing attorneys' conduct [that is, the repeal of the Code of Professional Responsibility and the enactment of the Rules of Professional Conduct] which occurred in November of 1988, (in the middle of the series of events at issue in these matters) the Board had first to address whether the new rules fundamentally altered the clear proscription set forth in DR 7–110(A) of the prior Code. After careful analysis of the rules and their underlying considerations, the Board arrived at the consensus reflected in the General Memorandum to the effect that the actions of the attorneys involving a so-called exchange of checks represented a violation under the rules governing the conduct of attorneys both before and after November 15, 1988. As indicated above, although each case was considered on its own merits, we were of the opinion that the legal reasoning as to whether or not a violation occurred lent itself to the reference to a General Memorandum in light of the repetition of the charges involved in these matters.

Having found violations of some or all the charges levied, we next turned to the issue of sanctions. While all facets of these cases raised troubling and complex issues which seemed to grow in geometric proportion to the hours consumed in their deliberation, there is no question that the range of sanctions was the most time consuming. We considered all available options. We researched and obtained the guidance of the ABA Standards, as well as the contrary arguments presented to us by the advocates along with many of our own. We remained mindful that there are in these cases, as in any disciplinary matter, three parties that warrant consideration: the lawyer, the bar in general and the public. In keeping with this concept, we discussed, reflected, and debated in meeting after meeting the appropriateness of a given sanction, maintaining an open mind about the sometimes diverse aspects each of these parties represents.

As a starting point in the process, we considered and came to a decision on whether the recommended sanction should be, in general terms, private or public. If one were to consider solely the issue of deterring the individual lawyer from further similar infractions, there is little question that a private reprimand would have served this purpose in all the cases. The facts in these matters indicated to us that the chain of events which occurred over the time in question resulted from the instigation of a single Judge who succeeded in a con game of enormous proportion. Such an individual, while in fact representing an isolated aberration, can, and unfortunately probably will, cause a cloud of suspicion to be cast over all other honorable members of the bench. Similarly, although the lawyers involved are members of the bar in good standing, many of whom have justifiably enjoyed fine reputations with no prior disciplinary violations, their failure to consider at the very least the appearance of the conduct in which they engaged, caused, and absent proper public disclosure will continue to cause, a sense of distrust in the minds of the public which has the right to expect the bench and the bar to maintain the highest of ethical standards.

As evidenced by the rules governing conduct "prejudicial to the administration

of justice" and the ethical considerations incidental to same, an attorney's professional conduct and, for the purpose of these cases, contact with a Judge, must be such that even the appearance of impropriety is avoided. The delicate task of ensuring a fair and impartial tribunal, both in fact and in appearance, is a fundamental necessity in our system. Accordingly, there was in our minds, a basic and proper distinction to be made between attorneys who loaned money to Fuyat who did not practice before his Court and those who did. The former, while in technical violation of the applicable rules, did nothing which could serve to undermine the administration of justice either in fact or appearance; the latter did. Therefore, after careful consideration of the purposes served by public sanctions, including but not limited to the guidance of all members of the bar in future conduct and the need to ensure public confidence in the integrity of the legal process, we concluded that for those attorneys who maintained a Family Court practice, a public censure was appropriate. We also considered in determining the appropriate sanction, the attorney's record before the Board. In this regard, we noted that the lack of prior violations seemed further to buttress our conclusion that the attorneys involved were not those with an established record of disregard for the Rules of Professional Conduct, but rather individuals who neglected to consider the serious consequences of their conduct which they knew or should have known was improper. Some cases involved what we considered to be aggravating circumstances which called for an enhancement of a public-censure recommendation and rose to a level which, in our opinion, called for a suspension. We trust that a review of the ABA guidelines, the case law, and our decisions in these cases will serve to demonstrate the reasons for such recommendation.

Throughout the long process of hearing and deciding these cases, the facts, issues, and overall aftermath of the Fuyat situation weighed heavily on the hearts and minds of each member of the Board. I would be remiss if I did not bring to the Court's attention the fact that in meetings alone we spent approximately 37 hours. Additionally, each of us individually labored long and hard in our effort to exercise our best judgment as to the issues presented in these cases. We were and remain mindful that as professionals we enjoy the privilege of self-regulation, a privilege which brings with it a grave responsibility. We submit these matters to you with the sole comfort that we have fairly and impartially discharged our duties in keeping with the faith expressed in each of us when we were appointed to serve on this Board.

## APPENDIX II

The General Memorandum referenced in footnote 3 of the text and appendix 1 reads in full as follows (with minor editing to give verbatim quotation to the Court Rules):

### GENERAL MEMORANDUM

Some of the cases presented before the Board were governed by the disciplinary rules of the Code of Professional Responsibility which governed attorneys' conduct which occurred prior to November 15, 1988. In those cases there were three (3) disciplinary rules alleged to have been violated:

"DR 7–110. Contact with officials.—(A) A lawyer shall not give or lend anything of value to a judge, official, or employee of a tribunal."

"DR 1–102. Misconduct.—(A) A lawyer shall not: * * * (5) Engage in conduct that is prejudicial to the administration of justice."

"DR 1–103. Disclosure of Information to Authorities.—(A) A lawyer possessing unprivileged knowledge of a violation of DR1–102 shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation."

The Board is of the opinion that the so-called exchange of checks involved in many of the cases presented constituted a violation of DR 7–110. Clearly the giving of a check which can be negotiated immediately for a check to be received or negotiated in the future is without question the giving of "a thing of value" and in our opinion, in fact, a loan.

In those cases involving conduct which occurred after November 15, 1988, the transaction(s) was (were) governed by the Rules of Professional Conduct. In these cases, the attorneys were charged with a violation of the following rules contained therein:

"Rule 3.5. Impartiality and Decorum of the Tribunal.—A lawyer shall not:

(a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;

(b) communicate ex parte with such a person except as permitted by law; or

(c) engage in conduct intended to disrupt a tribunal."

"Rule 8.3. *Reporting Professional Misconduct.* (a) A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

\* \* \* \* \* \*

(c) This rule does not require disclosure of information otherwise protected by Rule 1.6."

"Rule 8.4. Misconduct.—It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

(d) engage in conduct that is prejudicial to the administration of justice, including but not limited to harmful or discriminatory treatment of litigants, jurors, witnesses, lawyers, and others based on race, nationality, or sex;

\* \* \* \* \* \*

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law."

The Board considered carefully and rejected the argument that the Rules of Professional Conduct, particularly Rule 3.5, do not prohibit an attorney with regard to gifts or loans as specifically and broadly as the previous Rule DR 7–110. The comment to Rule 3.5 states "[m]any forms of improper influence upon a tribunal are proscribed by criminal law. Others are specified in the ABA Model Code of Judicial Conduct, *with which an advocate should be familiar.* A lawyer is required to avoid contributing to a violation of such provisions." (Emphasis added.) Canon 21 of the Rhode Island Canons of Judicial Ethics provides:

"Gifts and Favors.—(A) Neither a Judge nor a member of the judge's family residing in the judge's household should accept a gift, bequest, favor or loan from litigants, or from lawyers or from others whose interests are likely to be submitted to the judge for judgment."

We believe that the prohibition set forth in the Canon which is referred to in the comment to Rule 3.5, when read in conjunction with the rule itself, should be and is intended to prohibit an attorney from such conduct as giving or lending anything of value to a judge and would certainly encompass the giving of a loan.

The Board does not concur with the argument that the rules adopted and in effect after November 15, 1988, were intended to or did relax the clear prohibition set forth in the earlier rules. Considering the fact that attorneys should and must be sensitive to the appearance of impropriety, we do not feel that a prohibition against conduct involving loans to a Judge, particularly one before whom the attorney appears or is likely to appear, is a difficult one to recognize in the rules. It is the opinion of the Board, having reviewed and considered the rules, cases from other jurisdictions cited by both Chief Disciplinary Counsel and defense counsel, as well as the comments to the rules and the arguments presented, that the so-called exchange of checks and/or the giving of loans in the cases

before us constituted a violation of both the Disciplinary Code and the Rules of Professional Conduct as properly charged depending upon the dates of the transactions in question.

Having reviewed and considered the rules regarding reporting as they existed in the code prior to November 15, 1988, and under the rules thereafter, the Board concluded that in cases involving conduct which occurred prior to November 15, 1988, there was no violation. In our opinion a fair and reasonable reading of the new rules discloses that the reporting requirement is stronger, and hence appropriate violations were found in the applicable cases.

The Board was faced in these cases with situations of first impression in Rhode Island and accordingly researched and reviewed cases from other jurisdictions as cited in the memorandum of law presented by Chief Disciplinary Counsel and defense counsel. The facts, holdings, and reasoning in each of those cases were carefully considered by the Board on both the issues of whether or not a violation had been proven as well as with regard to the appropriateness of various sanctions to be imposed upon the attorneys for such violations. Additionally, the Board considered and was guided in large measure by the ABA standards pertaining to disciplinary matters. The standards referred to a number of factors, and we considered each in determining the appropriateness of the recommendation. Some of those most pertinent to the cases at bar were as follows:

1. Whether the attorney involved had an opportunity to receive a favor from the Judge, i.e., did the Respondent–Attorney or his law firm appear before the Family Court and, if so, with what regularity? Did the attorney ever notify opposing counsel or otherwise disclose the loan or exchange?

2. Although the loan or exchange in and of itself is a violation, what if anything, did the Respondent–Attorney do with regard to collecting the funds. Can a reasonable inference be drawn that the attorney expected or hoped for favors by forbearing on the recovery.

3. Was there a special relationship between the Respondent–Attorney and the Judge which would lead to the conclusion that the loan was a transaction between friends which would have taken place regardless of the Judge's position? In other words, no inference can be drawn that the attorney was seeking to in any way influence a prospective hearing as he or she did not appear before the Court nor did the likelihood of such a court appearance exist.

4. After the request by the Judge for funds, what action was taken by the Respondent–Attorney: was it reported to any authority, was there cooperation with Chief Disciplinary Counsel in the investigation of the matter?

5. What, if any, mitigating factors were present, such as the absence of a prior disciplinary record?

The facts in each of the cases are set forth in the decisions themselves, and one cannot ignore the striking similarity among them. The Board noted that the evidence presented did not disclose a situation in which an attorney offered money to a sitting justice, but rather in each of the cases the solicitation of funds was made by the Judge. In each instance, the Judge presented a story of dire financial circumstances which necessitated an immediate loan. In their defense, the attorneys stressed a charitable motive rather than an intent or expectation of a favor, and some quite candidly admitted a fear of retribution if the loan was not made. In the decided cases from other jurisdictions, the Courts did consider the overall circumstances and intent when addressing the issue of what sanction would be appropriate. The Courts properly took into consideration both aggravating and mitigating factors presented in the matters in deciding whether the attorney should be publicly censured or whether the conduct rose to a level which called for a suspension from the practice of law or disbarment. In undertaking the same type of analysis, we conclude

that in those cases in which there was no clear and convincing evidence to prove that the conduct was intended to obtain a specific favor, a public censure is warranted when the attorney involved was one who practiced before the Family Court. Those attorneys who were found to be in violation of the rules but did not appear before the Court and whose conduct therefore did not affect, either directly or in appearance, the administration of justice, a private censure is appropriate. In those instances where aggravating circumstances existed, a suspension is appropriate.

As set forth in the transmittal correspondence submitted with these decisions, the facts in these cases, as presented in the hearings which took place before us, demonstrated that the chain of events resulted from the instigation of a single justice who unfortunately seems to have succeeded in convincing attorneys to make loans to him for a variety of reasons, all of which involved desperate personal circumstances. While the attorneys may or may not have been acting out of personal sympathy, the conduct which took place over a protracted period of time cannot be tolerated in a system which must function with the full confidence of the public.

MURRAY, Justice, concurring.

In concurrence I write separately to state specifically my position with reference to certain matters set forth in the majority opinion.

First, I believe that this court's standard of review of the disciplinary board's recommendations needs to be elucidated. Our case law indicates that we give great weight to the board's disciplinary recommendations. The ultimate responsibility for imposing discipline resides with this court. *See Carter v. Walsh,* 122 R.I. 349, 354, 406 A.2d 263, 265 (1979); *Carter v. Folcarelli,* 121 R.I. 667, 672, 402 A.2d 1175, 1178 (1979).

It is my conviction that this standard does not allow the court to engage in de-

novo review of a matter even if it is so inclined. My research confirms this conviction. The Supreme Court for the State of Utah has a similar standard of review to which I ascribe. That court has adopted the position that it will accept its board's recommendations unless they are arbitrary or unreasonable. *See In re Calder,* 795 P.2d 656, 657 (Utah 1990) (citing *In re Hansen,* 584 P.2d 805, 807 (Utah 1978)). It is the view of the District of Columbia that the Court of Appeals must implement the board's recommendations "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." *See In re Morris,* 495 A.2d 1162, 1163 (D.C. App. 1985) (quoting D.C. Rules Annot. Rule XI). Our sister state Connecticut has common-law review of disciplinary-board recommendations. That state treats its disciplinary board as a quasi-judicial body, as does Rhode Island. *See Pinsky v. Statewide Grievance Committee,* 216 Conn. 228, 233, 578 A.2d 1075, 1078 (1990); Rule 1.2 of Rules of Procedure of the Disciplinary Board of the Supreme Court of Rhode Island. Thus "the right of an attorney to judicial review in a disciplinary matter should [not] be any different than the process accorded other professionals in disciplinary matters before licensing and/or disciplinary boards." *Pinsky,* 216 Conn. at 235, 578 A.2d at 1079. Accordingly, in Connecticut the scope of that court's review is "limited to a review of the record to determine if the facts as found are supported by the evidence contained within the record and whether the conclusions that follow are legally and logically correct." *Id.* at 234, 578 A.2d at 1078.

Second, I am not persuaded as the majority is that "no evidence demonstrates or even suggests that any of the attorneys planned to influence Fuyat by acceding to his requests" to lend money. *See majority op.* at 316. The majority opinion states that some attorneys acceded to the request to make loans because they feared retribution from the judge. The Illinois Supreme Court suspended an attorney for eighteen months under similar facts in the case of *In re Karzov,* 126 Ill. 2d 33, 127 Ill.Dec.

774, 533 N.E.2d 856 (1988). In *Karzov* a judge asked an attorney for a $1,000 loan so that he could take a vacation. The attorney had appeared before the judge in the past and anticipated appearing before him in the future. The attorney testified that although he resented being asked for a loan, he lent the money because he feared retribution from the judge. The Supreme Court of Illinois stated that even though the attorney had been coerced, the loan was in fact made with the intention of influencing the judge. That is, the attorney made the loan with the intent of influencing the judge not to seek retribution. Accordingly, I cannot adopt the majority's conclusion that those attorneys who made "loans" to Judge Fuyat out of fear that Judge Fuyat would seek retribution if the loans were not made did not do so with the intention of influencing the judge.

Many of the facts recited in the majority's decision, such as the pre-existing friendships between Judge Fuyat and the attorneys in question, the noncontested nature of the appearances of the attorneys before the judge, and the fact that the loans were not public knowledge, are interesting background material. The disciplinary board appropriately considered these facts in recommending discipline.

In my view none of these factors minimize the unethical conduct of the attorneys involved.

Consonant with the tone of this concurrence, comment is made on the fact that other dispositions by way of admonitions and private censures were meted out to others not mentioned in the majority opinion. I feel no less critical of that conduct that did not result in harsher sanctions, but I am willing to abide by the deliberations that have been made by the board.

In conclusion, the stake here is the public's confidence in the judicial system. That confidence can only be maintained by adherence to an inflexible principle that attorneys and judges avoid even the slightest appearance of impropriety. If there is any ambiguity or doubt concerning a trans-

action's propriety, those doubts should be resolved against those who participate in the activity.

For these reasons I concur with the sanctions imposed, deeply conscious of the difficulty of the task that the disciplinary board [1] has performed with intelligence, discretion, and professionalism.

WEISBERGER, Justice, dissenting.

At the outset I should like to express my deep respect for the members of the disciplinary board who during a period of more than one year conducted hearings and evaluation meetings not only in respect to the twenty-one attorneys who are the subject of this opinion but also in respect to a number of other attorneys for whom public discipline was not recommended. Each attorney was given a separate evidentiary hearing by a panel designated for that purpose. Thereafter, the entire board evaluated the findings and recommendations of each panel. The recommendations concerning each respondent attorney were sent to this court along with a written decision setting forth findings of fact and conclusions of law. In each instance a transcript of the proceedings was furnished to the court as well.

From the time of transmittal of the recommendations and supporting material the members of this court reviewed the record in each case and gave each attorney and his counsel an opportunity to show cause in writing and orally why the proposed disciplinary sanction should not be imposed.

Both the members of the disciplinary board and the members of this court carefully considered the factual background in each case along with the relevant disciplinary rules that were in effect at the time of the conduct upon which the charges were based.

I have no doubt of the high motivation of the members of the disciplinary board who serve without compensation for the sole purpose of maintaining the ethical standards upon which the practice of law must

1. The board was originally formed on May 1, 1975. It is composed of nine members. Each member serves without compensation for a three-year term.

be based. As set forth in appendix 1 to the opinion of the majority, the members of the disciplinary board were mindful of the privilege of self-regulation and the grave responsibilities that accompany it.

In like manner the members of the court were fully aware that they were dealing with a case of first impression in this jurisdiction. They were fully aware of the enormous import of imposing discipline upon members of the bar of previously good reputation and outstanding professional competence. They balanced the gravity of this task against the necessity of maintaining public confidence in the ethical standards of the profession and in the impartiality of the administration of justice.

Although I do not question the integrity, the good faith, and the rational basis of the conclusions reached by the disciplinary board and by my colleagues, I come to a different result based upon what I believe to be an equally conscientious evaluation of the same factual material. To a great extent my conclusions are based upon findings of fact made by the disciplinary board itself. Let us examine some of these findings.

As set forth in appendix 2 to the majority opinion the disciplinary board issued a general memorandum in which certain overall findings of fact were stated. One of these general findings should be emphasized at this point:

"The facts in each of the cases are set forth in the decisions themselves and one cannot ignore the striking similarity among them. The Board noted that the evidence presented did not disclose a situation in which an attorney offered money to a sitting justice, but rather in each of the cases the solicitation of funds was made by the Judge. In each instance, the Judge presented a story of dire financial circumstances which necessitated an immediate loan. In their defense, the attorneys stressed a charitable motive rather than an intent or expectation of a favor and some quite candidly admitted a fear of retribution if the loan was not made."

I accept the foregoing finding of fact and agree that it represents a common thread that may be discerned in all the cases presented to us.

Both the disciplinary board and my colleagues on this court concluded that Judge Fuyat had skillfully maneuvered each of the attorneys into either exchanging checks with him in order to assist him in dire financial circumstances or arranging loans for him in circumstances of temporary monetary embarrassment. These findings are well synthesized by the comment in the transmittal letter (appendix I):

"The facts in these matters indicated to us that the chain of events which occurred over the time in question resulted from the instigation of a single Judge who succeeded in a con game of enormous proportion."

The majority, in its opinion, reflects this finding and states without equivocation that "no evidence demonstrates or even suggests that any of the attorneys planned to influence Fuyat by acceding to his requests." The majority goes on to comment:

"Most of the attorneys acted out of sympathy and/or friendship; they complied with Fuyat's urgent requests in order to avoid Fuyat's being subjected to the public embarrassment that the judge represented as imminent."

It is also apparent from the findings of the disciplinary board and the majority that Fuyat seldom, if ever, decided a controverted issue. He was not only financially irresponsible, but was also professionally incompetent. The evidence in all the cases clearly indicates that on a typical judicial day Fuyat would either call the calendar or have his clerk do so. He would then retreat to his office where he would spend the day either telephoning on matters known only to himself or conferring with attorneys in order to exhort them to work out their differences so that he would not need to decide the issues in the cases. Consequently his track record indicated that he was highly unlikely to be in a position to grant judicial favors.

The general tenor of these undisputed facts that underlie the findings of the disciplinary board and the majority of this court persuades me that we are, however well-intentioned, punishing the victims of a sly, unscrupulous, and unethical judicial officer. There is no question in my mind that every one of these attorneys would have disassociated himself from Fuyat and denied his requests without hesitation if he had been aware of the scope and magnitude of the Fuyat machinations. We have the benefit of twenty-twenty hindsight as we review and correlate all these files. Each of the attorneys knew only of the request made to him or to his immediate associates. Each committed the wrong of misplaced compassion. Each felt that he was dealing with a judge who could be relied upon to meet his obligations, both financial and professional. A judicial officer is normally a person of considerable prestige who has merited wide respect in his or her community. He or she may be presumed to act in accordance with law and applicable ethical standards. A lawyer should not be strongly condemned for viewing a judge in this light, at least up to the point where the lawyer has reasonably clear notice to the contrary. I believe that by the time these lawyers had notice that Fuyat was unworthy of either the prestige or the respect due a judicial officer, it was too late to withdraw.

As each of these attorneys was suddenly importuned by Fuyat, his opportunity for reflection was extremely limited. Even though in some instances the attorney might have had a chance to reconsider as he engaged in implementing the transaction requested, it is important to bear in mind that the attorney had already committed himself and would, therefore, have been most reluctant to reverse his indicated course.

I recognize that the members of the disciplinary board and my colleagues have as a goal the maintenance of public confidence in the bar and in the judicial system. This confidence has obviously been eroded by the outrageous conduct of Fuyat. The tragedy is, however, further compounded by his touching the lives of others who, without his persuasion, would have been wholly innocent of wrongdoing. Public confidence in the administration of justice can be earned and maintained only when the judicial system is seen to render justice in the individual case. I do not believe that the "appearance of impropriety" supports the imposition of the recommended discipline upon the respondent attorneys in this case.

It would be my decision to impose private censure upon all those for whom public censure is recommended. I would impose public censure upon those attorneys for whom suspension is recommended. It must be noted that the sanction of suspension, particularly for an extended period, will have a devastating effect upon the professional career of the attorneys involved. I do not believe that their conduct in arranging loans for Fuyat is deserving of this drastic sanction.

I tend to be persuaded by the conclusion of the Supreme Court of Illinois in *In re Corboy*, 124 Ill. 2d 29, 49, 124 Ill.Dec. 6, 15, 528 N.E.2d 694, 703 (1988), wherein the court recognized that the respondent attorneys were "sailing in uncharted waters." The attorneys in this case were not aware of the stringent interpretation that our court has placed on DR 7–110(A) of the former Code of Professional Responsibility or the inferences drawn from the general language of the new Rules of Professional Conduct that became effective November 15, 1988. The disciplinary board itself recognizes in its letter of transmittal that if the issue of deterring the individual lawyer from similar infractions were alone considered, "there is little question that a private reprimand would have served this purpose in all of the cases." I do not believe that the severe sanctions imposed will be necessary to deterrence. I further do not believe that such sanctions will in the long run restore public confidence in the administration of justice.

Therefore, I respectfully dissent.